RITA W. GRUBER, Chief Judge
April Major appeals from an order of the Faulkner County Circuit Court granting Michael Penney's motion for change of *451 custody. April contends that the circuit court erred in finding that there was a material change in circumstances sufficient to warrant a change in custody and that a change in custody was in the best interest of the children. We disagree and affirm.
April and Michael were married on March 22, 2007. The parties have two children, T.P., born November 1, 2006, and P.P., born July 9, 2008. The parties were divorced by an order of the Faulkner County Circuit Court on March 19, 2010. The order incorporated a written custody, support, and property-settlement agreement, which contained the following:
10. The parties shall have joint custody with Wife retaining primary custody of the parties' minor children, subject to Husband's visitation privileges. Both parties are in the military and will be deployed in 2010 and/or 2011. When the residential parent is away for extended time, the other parent will be the primary caregiver. If for some reason the other parent cannot provide the childcare, then care shall be the responsibility of Barbara Penney, paternal grandmother or Lori Scroggins, maternal grandmother.
The agreement further provided that Michael's visitation would be determined according to whether the parties resided in the same county or different counties. If the parties resided in the same county, Michael would have the children every other week. Otherwise, Michael's visitation would be every other weekend with an extended period in the summer and specified holiday visitation. The order provided that child support would be based on whether custody was alternated weekly, and it stated that the "parties agree to enter an Order setting child support when it becomes due."
On January 13, 2015, Michael filed a motion for change of custody and for contempt. He alleged that there had been a material change of circumstances since the divorce decree was entered, specifically stating that April failed to provide physical, emotional, and financial care for the children; to provide a stable and wholesome environment for the children; and to set a proper moral example for the children. Michael also alleged that April violated the terms of the divorce decree by exposing the children to overnight stays with persons with whom she is romantically involved and by failing to inform him of her current place of residence, employment, and phone number. A hearing took place on March 21, 2017.
April testified that at the time of the hearing she had been in the Arkansas Army National Guard for almost 19 years and had been deployed overseas three times, including once to Iraq from 2010 to 2011. She explained that after the parties divorced in 2010, she lived in Fordyce from May 2010 to May 2015, when she had to move from her home due to bankruptcy. From 2012 to 2014, April was in nursing school. In January 2014 when the children were in kindergarten and first grade at Bearden Elementary School, April signed a temporary guardianship of her children to Michael's mother, Barbara Penney, in order for April to finish her final semester of nursing school. The children were familiar with Barbara as she had kept them when the parties were deployed. April did not finish the program because of the strict attendance policy. She got the children back in June 2014 and then began working at Camp Robinson doing AFTPs (Additional Flight Training Periods). April testified that from May 2015 until September 2015, she lived with Laurie and Ricky Scroggins, her mother and stepfather, in Cleveland, Arkansas.
April testified about an incident on July 25, 2015, when she had been to a bar with *452 a friend. She called a friend, Christopher Morrow, to pick her up because she was "too drunk to drive." Morrow took her to a Camp Robinson billeting room where he was staying with his son. April stated that Morrow made sexual advances, she told him to stop, and she slapped him. April and Morrow argued outside, and April called Eric Brown, who was also staying in a billeting room, and slept in his room.
The children started school in Nemo Vista on August 25, 2015, where they attended for one month until April had an altercation with her mother and stepfather. April explained that on the day of the altercation in September 2015, she had been cleaning out a trailer on her mother's property to live in. That evening, April, her boyfriend Eric Brown, her mother, and her stepfather were drinking on the back porch of her mother's home. P.P. was at the home during this time, but T.P. was with a friend. April testified she drank three "whiskey and cokes." After her mom went inside, April asked her stepfather a question that made him mad. April testified that as she started to go inside, her stepfather came from behind and grabbed her, and a physical altercation ensued. April recalled that her stepfather threw her into a glass coffee table, which cut her back. April also testified that her stepfather hit her in the head with a shotgun, and he was on top of her punching her in the head. April stated that police came after a call to 911 and pulled her stepfather off her. April and her children never spent another night in the home.
After the altercation, April moved to North Little Rock to live with Sharon Haley, a friend from her National Guard unit. She lived there from September 2015 to February 2016, and the children attended school in North Little Rock during this time. While she lived with Haley, April had Eric Brown meet the children when they got off the school bus because she did not trust Haley. April testified that although she had been in a dating relationship with Eric, they were not dating when she lived with Haley, and he helped her with the children. April explained that she had to move out of Haley's home because Eric called her after school one day to inform her that it smelled like marijuana.
On January 30, 2016, April signed a temporary guardianship giving Pam and Danny Brown[1] authority over the children's educational and medical decisions. Pam Brown lived in Bearden and was a former babysitter of the children. At that time, April worked at Green Bay Packaging near Morrilton and lived in Conway with a roommate. She explained that her hours fluctuated and that she often worked more than 40 hours a week. She stated that she sent the children to live with Ms. Brown so they would not have to "keep changing schools" and that Barbara Penney, with whom she left the children previously, did not have suitable living arrangements at the time. While living with Ms. Brown, the children attended school in Bearden and had improved attendance. The children lived with Ms. Brown until April completed her two-week National Guard training in June 2016. April testified that she saw the children as often as she could when they lived with Ms. Brown, but she could not recall how many times. She also testified that she had communicated daily with them through FaceTime or text on their iPads. April explained that she did not take the decision to leave the children with Ms. Brown lightly, but she felt she did not have a choice because she had a job in Conway with fluctuating hours and did not have child care. In addition, she explained that she "had to walk away from *453 her family" after the altercation with her mother and her stepfather. April testified that she informed Michael that the children were living with Ms. Brown and discussed it with him "after the fact."
From June to August 2016, April moved to North Little Rock, where she and the children lived with her friend Wayne Cates, whom she had known for 17 years from the National Guard. April testified that in August 2016 she entered into a lease-to-own agreement on a house in Cabot purchased by Cates. The agreement provided that if April did not make the payments for a certain period of time, the house would return to Cates and she would be required to move out. She was unable to obtain a traditional mortgage due to her bankruptcy. She explained that Cates was not her boyfriend but lived in the home with her and that the children loved Cates. April testified that her best friend, whom she knows from the military, lived across the street with her husband and three sons. From 2016 to the time of the hearing, the children attended Cabot schools. She explained that the children were doing well in school. April testified that while the past two years had been hard on her, she was the "consistent, stable one" who has been there for the children the entire time. She stated that Michael had once refused summer visitation because he could not afford it and that Michael could not provide stability.
Becky Newton, the secretary for Bearden Elementary School, testified that P.P. and T.P. had a total of thirty-six tardies during the 2014-15 school year, when they were in the first and second grades. She stated that they had more tardies than any other students she had known. She also stated that the children had been absent 7.5 days during the school year.
Pam Brown, who lived in Bearden, testified that she first met T.P. and P.P. when she babysat them in 2014. She stated that she had physical custody of the children on two occasions. When Ms. Brown had custody of the children the first time, she recalled April had reached out to her because she was in "in a hard place" and "did not have finances to take care of them." Ms. Brown testified that April lived in Fordyce and had a job at Home Depot in El Dorado and told Ms. Brown her hours were "messed up." At this time, April lived fourteen miles away in Fordyce and visited the children only "a couple of times." Ms. Brown testified that April paid her $300 and bought food once using her food-stamp card. The second time she had custody was from February to June 2016. Ms. Brown testified that April paid Ms. Brown $800 a month and that April took the children to eat one time and went to two of T.P.'s ballgames.
Ms. Brown explained that she did not have good communication with April when the children resided with her, explaining that it might take April "five or six days" to answer a text. Ms. Brown recalled specific instances, including an opportunity T.P. had to play all-star baseball but missed out because April did not respond to her text and Ms. Brown's inability to get dental care for T.P. due to April's failure to sign papers at the dentist's office. In addition, Ms. Brown testified that Michael Penney, who was deployed, texted her almost every other day when she kept the children. She was unaware of how he found out she was keeping the children. She stated that Michael would call and text to see if she needed anything and offered to send money. Ms. Brown testified that Michael was "the more involved parent" when the children were in her care.
Laurie Scroggins, April's mother, testified about two altercations with April, including the one in September 2015. She stated that they were out on the porch *454 drinking. She recalled that April had been drinking whiskey, which "makes her mean." Laurie testified that April drank a fifth of whiskey that night while P.P. was in her care. When asked whether there were regular occasions that April would drink alcohol in excess in the presence of the children, Laurie stated that April "likes her whiskey" and that it had occurred "numerous" times.
Kim Smith, Ms. Brown's daughter-in-law, testified that around 2015 when Ms. Brown was babysitting the children, she helped clean April's home in Fordyce in preparation for a DHS inspection.[2] She stated that, in her opinion, the home was not livable, testifying that there was "[f]ilth and dog feces on, both the furniture in the living room and in the bedroom. Trash. Dirty clothes." Ms. Smith said that the walls looked like they could have been "molded." When she cleaned the home, Ms. Smith thought the children were still living in the home and Ms. Brown was only babysitting the children.
Michael Penney testified that in 2010 he was employed by a contractor at Red River Army Depot in New Boston, Texas, which is 18 miles from Texarkana, Arkansas. While he was employed by this contractor, he was deployed to Kosovo. Upon his return, he no longer had that job due to a reduction in force. He then began working for New Millennium Building Systems in Hope. He was later terminated around 2014 and returned to work at Red River Army Depot, where he was employed at the time of the hearing. Michael worked ATFPs at Camp Robinson during times when he was laid off or fired from his job and not deployed.
Michael testified that while he was deployed in Kuwait he learned from a Facebook message that the children were living with Ms. Brown. From that point on, he communicated with Ms. Brown every other day. Michael expressed his concern for stability in the children's lives, specifically in regard to their home, school, and education. He was also concerned about the number of their tardies and absences.
In October 2016, Michael purchased a home in Ashdown with a traditional mortgage cosigned by his father. Michael testified that he has financial stability and earns enough income to provide a home for his children. He explained that he has a family-support system in Ashdown as his father, mother, and sister live nearby and can help on his drill weekends. Michael testified that his girlfriend, Leslie Johnson, spends the night at his home but that she had not stayed overnight in the presence of the children.
With regard to his living arrangements after his divorce from April, he testified that he lived in North Little Rock after the divorce until he was deployed to Kosovo from 2010 to 2011. Upon returning in 2011, he lived with his father until he remarried in 2012. He left again for Kosovo shortly after his marriage. He lived in Hope with his wife after returning from Kosovo. Michael later divorced in March 2014 and rented a home in Hope. After his stepmother died in 2014, Michael's dad asked him to move into his home in Ashdown. After Michael filed for change of custody, he was deployed in the fall of 2015.
Wayne Cates testified that he and April became friends in 2000 when he was *455 her supervisor; he is nearly twice her age. They had been deployed together in 2004 and bonded after some close friends were killed. They saw each other at Camp Robinson until Cates retired in 2011. They reconnected in January 2016 at which point he offered to help April. Cates testified that April and the children moved in with him at his home in North Little Rock while they were "house closing." Cates purchased a home in Cabot, and April entered into a lease-to-own agreement to purchase the home from Cates.
Cates testified that he was never in a romantic relationship with April. He explained that he stayed in the Cabot home with April after she moved in and helped her with the children before and after school. Cates explained that when he spends the night, April and her daughter sleep in one room and he sleeps in T.P.'s room on the bottom bunk. Cates testified that he takes the kids fishing and to extracurricular activities and that he has bonded with T.P. Cates testified that the children are happy and well adjusted.
Eric Brown, a former boyfriend of April's, testified that April has a good relationship with her children. He was present when April had the altercation with her mother and her stepfather in September 2015, and testified that they had both been drinking that evening. Eric stated that on one occasion during their one-year relationship he stayed overnight on a couch at April's mom's house in the presence of the children. In addition, Eric explained that he stayed overnight at Haley's for one month when April and the children lived there, but they had stopped dating by that time. He testified that he slept downstairs and April and the children slept upstairs.
At the conclusion of the hearing, the circuit court made a detailed oral ruling, ultimately finding that there was a material change of circumstances to warrant a change of custody to Michael and that the change of custody was in the best interest of the children. The circuit court entered a written order on May 1, 2017, and April now appeals those findings.
A judicial award of custody will not be modified unless it is shown that there are changed conditions demonstrating that a modification of the decree will be in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to, or not known by, the circuit court when the original custody order was entered. Grindstaff v. Strickland , 2017 Ark. App. 634, at 3, 535 S.W.3d 661, 663-64. Generally, to promote stability and continuity in the life of the child and to discourage repeated litigation of issues that have already been decided, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. Id. The party seeking modification has the burden of showing a material change in circumstances. Id.
This court performs a de novo review of child-custody matters, but we will not reverse a circuit court's findings unless they are clearly erroneous. Taylor v. Taylor , 353 Ark. 69, 110 S.W.3d 731 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. Montez v. Montez , 2017 Ark. App. 220, at 8, 518 S.W.3d 751, 756. Because the question whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest.
*456 Neumann v. Smith , 2016 Ark. App. 14, at 12, 480 S.W.3d 197, 204. There are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as those involving minor children. Id.
April first argues that the circuit court erred by finding that a material change of circumstances sufficient to warrant a change in custody had occurred. At the conclusion of the hearing, the circuit court stated from the bench, "There is no doubt that there is a material change of circumstance." The circuit court carefully reviewed the testimony at length in support of its decision. First, the circuit court found Becky Newton's testimony about the children's numerous tardies and absences to be both credible and significant, stating that there was an "inordinate" amount that could result in a FINS case had it been brought to the attention of the court by the school district. Second, the circuit court found Pam Brown's testimony to also be credible. The court was troubled by the "inordinate" amount of time it took for April to respond to Ms. Brown's communication and lack of "good, consistent communication, especially about the major things in these children's lives." Third, the court was "greatly" concerned that while Michael was deployed, he found out through Facebook that the children were living with Ms. Brown. The court indicated this was a failure in coparenting and a "big failure" on April's part that should not have happened. Fourth, the court found April's use of alcohol to be a problem. While the court did not generally find Laurie Scroggins's testimony credible, it did with respect to April's use of alcohol, specifically stating, "Ms. Scroggins, generally, wasn't creditable, but I think given all the other testimony I do think that, Ms. Major, there is just a little too much alcohol going on in your life. And it seems like bad things happen when you get to drinking." Fifth, the court found Kim Smith's testimony about cleaning April's home to be "somewhat credible." Sixth, the court considered the testimony of Wayne Cates and the relationship between him and April. The court was unable to determine whether there was a romantic relationship but stated it was a "unique relationship" to have a grown man living in the home and to be so involved in the children's lives when they are not his children or grandchildren. The court stated that while Cates provided stability as far as being there when the children got home from school, it was not sure what Cates's involvement would be in Ashdown if Michael had custody. Seventh, the court discussed Eric Brown's testimony, also noting he had a "unique relationship" with April. The court did not fully believe Eric's testimony that he was only a "house mate and not a romantic partner" of April's at the time they lived together. The court recognized that during "crisis moments" in April's life, "these men seem to show up and help her. But she never has a romantic relationship with any of these men." The court also referred to the incident at the Camp Robinson billeting room where alcohol was again involved.
Finally, the court addressed the parties. The court found that the divorce decree was imperfect because it intended to establish child support at a later date. While the court recognized April's argument that there were similarities between the parties because they both had new living arrangements beginning in 2016, it found a distinction. The difference was that Michael had a traditional mortgage cosigned by his father and April had a lease-to-own agreement with Cates, and the court was unable to determine if Cates and April had a romantic relationship and whether it would remain stable after the proceeding. While April argued she had immediate stability beginning in August 2016, the court examined *457 her past practice, which established that "these children were left with someone who was not their blood relatives on two different occasions" and that Michael found out about one of these times through Facebook. The court also found "a lack of sobriety" on April's part and did not believe her testimony that all the men she testified about have been just "friends." The court found that the educational stability for the children was lacking because they have been moved around. While the court had knowledge that some of the schools were good, it explained that "what makes them great is consistent attendance." After carefully considering all the evidence, the circuit court found there was a material change of circumstances to warrant a change of custody and that the change was in the best interest of the children.
On appeal, April contends that there had been no material change of circumstances since the divorce, arguing that since the divorce both parties had been deployed; had been in relationships; had changes in employment; and had lived in multiple residences. She cites caselaw holding that circumstances that existed at the time of the divorce cannot be considered material changes and argues that the circuit court failed to consider the circumstances at the time of the parties' divorce. We disagree.
The custody agreement incorporated into the divorce decree specifically lists persons who are able to keep the children when the parties are unable to do so. When April had difficulty caring for the children due to her circumstances, she twice left them for extended periods in the care of Ms. Brown, a person who was not contemplated as a caregiver at the time of the decree. Moreover, on one occasion, Michael learned of this through Facebook while he was deployed. Ms. Brown's testimony, which the court found credible, showed that she had difficulty communicating with April during the times she had possession of the children, including on matters that were significant in the children's lives. Ms. Brown testified that April visited the children only a couple of times during each of these periods, including the period when April lived only 14 miles away in Fordyce.
At the time of the divorce decree, the children were not yet in school. There was much testimony about April's numerous moves, which resulted in the children changing schools five times in two years. While April points out the evidence of Michael's moves, he was not the primary custodian, and it did not affect the children's educational stability. Ms. Newton from Bearden Elementary testified that, together, the children had 36 tardies and 7.5 absences in one school year. In her 20 years with the Bearden School District, this was the most tardies she had ever known.
The circuit court also found April's use of alcohol to be significant, and it believed her mother's testimony as to the alcohol use. Scroggins testified that on the night of the 2015 confrontation, April was drunk. P.P. was at the home during this confrontation, and the divorce decree prohibited "the excessive use of alcohol while the child is in their custody." In addition, the court found that April had "unique" relationships with both Cates and Eric Brown. The court did not fully believe that Eric was not in a romantic relationship with April when he lived with her and the children. Likewise, the court was unable to determine whether Cates was in a romantic relationship with April.
Based on our de novo review, we conclude that there was sufficient evidence from which the circuit court could have found a material change of circumstances *458 existed to support a change in custody. Accordingly, we cannot say that the circuit court's decision on this issue is clearly erroneous.
Finally, we hold that the circuit court's finding that it was in the children's best interest to change custody to Michael was not clearly against the preponderance of the evidence. The circuit court, in its oral ruling, found Michael to be the parent who is responsible and stable. It did not agree with April's argument that the children were unharmed by the numerous moves, stating, "It was just too much. It is against their best interest." The court stated that Michael had relatives around him in Ashdown who could help him care for the children, including his sister, his father, and his mother. With respect to April, the court was concerned that all of her friends were military friends, and "because of the nature of military work, sometimes they are more transient, because they have to be, because we rely on them. That is not necessarily what brings stability into a child's life."
While both parties had established their current homes in late 2016, the court found it significant that Michael financed his through a traditional mortgage, cosigned by his father, whereas April was in "a lease-to-own arrangement with the person that the court is unable to determine if there is a romantic relationship going on or whether or not that is going to remain stable after the proceeding is terminated." While April argued that she had stability beginning in August 2016, the court considered past practice, which included twice leaving her children with a person who was not a blood relative and failing to inform Michael on at least one of these occasions.
Based on the foregoing, we hold that the circuit court's decision to change custody to Michael was not clearly erroneous, and we affirm its decision.
Affirmed.
Abramson and Gladwin, JJ., agree.

Danny had previously been married to April's mother.

With regard to Kim Smith cleaning her house, April explained that at that time the children had often been staying with Pam when she was working in North Little Rock at Camp Robinson. April explained the house was messy because her dog had been left at the home, and she only had someone going by there to feed it and let it out. April said that there had been "several anonymous calls" leading to DHS investigations, but DHS had never made a "finding against me."