

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-16-818

| | |
|---|---|
| DANIEL MONTEZ | **Opinion Delivered:** April 12, 2017 |
| APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72DR-14-1919] |
| V. | |
| CONSUELA MONTEZ (NOW TRUJILLO) APPELLEE | HONORABLE JOANNA TAYLOR, JUDGE |
| | REVERSED AND REMANDED |

## RAYMOND R. ABRAMSON, Judge

Daniel Montez appeals the Washington County Circuit Court's order denying his motion to change custody of his children, M.M. and J.M., and granting the motion of his former wife, Consuela Montez, to modify his child-support payments. On appeal, Daniel argues that the circuit court erred in finding that he failed to establish a material change in circumstances warranting a modification of custody. In the alternative, Daniel argues that the court erred in modifying his child-support payments, imputing his annual net income to $398,690, and failing to apply the factors from Arkansas Supreme Court Administrative Order Number 10 ("Administrative Order No. 10") that would require a downward deviation from the family-support chart. We reverse and remand.

SLIP OPINION

On January 9, 2015, the Washington County Circuit Court entered a divorce decree for Daniel and Consuela. The decree incorporated the parties' property-settlement and child-custody agreement. The agreement provided in part

1. <u>Child Custody and Visitation</u>: The parties agree that they are both fit and proper parents. The parties agree that they shall enjoy joint custody of the two minor children, [M.M. and J.M.,] and shall endeavor to have equal time with the minor children as delineated herein.

a. Each parent shall have the minor children in his/her physical care and custody alternating weeks from Friday at 6:00 p.m. until the following Friday at 6:00 p.m., or as otherwise mutually agreed by the parties. The parent picking up the children for his/her week shall provide transportation.

. . . .

2. <u>Support and Maintenance of the Children</u>:

a. That because the parties shall share joint custody and spend equal time with the children, neither party shall pay child support to the other.

. . . .

3. <u>Division of Property</u>:
. . . .

a. Business: During the marriage, the parties each owned an equal one-half share of businesses they owned and operated during the marriage, namely "Finishing Touches," a construction business, and "Venture Properties of NWA," which rents and manages investment properties. [Consuela] shall relinquish any and all ownership interest and liability in these businesses . . . as well as her employment at "Venture Properties" with the exception of and in exchange for the following:

. . . .

ii. Weekly payments of $500.00 (an amount equal to her net pay as an employee of "Finishing Touches") for three (3) years following the filing of this Order, due on each and every Friday beginning with the first Friday in January 2015. Payment shall be made regardless of the status of the business or [Consuela]'s marital status.

On October 29, 2015, Consuela filed a motion to modify the child-support agreement in the divorce decree. She alleged that she had remarried on September 2, 2015, and since that time, Daniel had refused to financially help the children while they

were at her home. She attached the parties' 2014 income tax return that showed Daniel's net income was $350,008, or $29,167 per month. She alleged that her annual income is $26,000 from weekly payments of $500 from Daniel's business. Thus, she argued, pursuant to Administrative Order Number 10, Daniel's child-support obligation should be $6,058.07 per month. She noted that her child-support obligation based on her weekly income should be $632.33 per month. Accordingly, she asked the court to order Daniel to pay her the difference, $5,425.74 a month.

On February 11, 2016, Daniel filed a motion for modification of custody. He asserted that since their divorce, there had been a material change in circumstances warranting that he be the primary custodial parent. He alleged that Consuela's new husband, Richard, had pled guilty to a fourth driving while intoxicated ("DWI") offense on September 25, 2015; that he had been sentenced to five years' imprisonment with three years' suspended imposition of sentence; that he is expected to be paroled in October 2016; that Consuela and Richard have a violent relationship that has required police intervention; that M.M. had smoked marijuana and had consumed alcohol while in Consuela's custody; and that M.M. had been suspended from school for truancy.

Consuela also filed a motion for modification of custody on February 11, 2016.[1] She alleged that there had been a material change in circumstances warranting that she be the primary custodial parent. She asserted that Daniel had been hostile to her; that he had alienated the children from her; that the children had been exposed to drunkenness and

---

[1]She also informed the court that the parties had attempted mediation of the custody and support issues on February 4, 2016, but they were unsuccessful in reaching an agreement.

violence at Daniel's home; that Daniel's adult children had attacked M.M.'s boyfriend; that several other people lived at Daniel's home, including his adult son who had been incarcerated for assault and battery of his girlfriend; and that the children had entered counseling due to depression.

On June 6, 2016, the court held a hearing on the motions. Consuela testified that during the marriage, she was the primary caregiver for the children. She stated that she originally declined child support from Daniel because she believed she had a steady income. She stated that after she married Richard, Daniel stopped providing the children with money for lunch and extracurricular activities and told them to ask Consuela for the money.

Consuela explained that her husband Richard is currently incarcerated for his fourth DWI but that she anticipated his release from prison in July. She stated that when he is released, he must attend Alcoholics Anonymous meetings and counseling. She denied that Richard drank or was violent in front of the children but admitted that he had physically assaulted her. She discussed three different occasions where she had called the police concerning disputes between her and Richard. Specifically, on July 5, 2015, she called the police after Richard had kicked in the door to their house. She also called the police as a result of a "heated" argument at their home but explained that she only wanted the police to supervise Richard as he removed his personal items. She further discussed an incident that had occurred in Wisconsin when Richard went to jail after he had pushed her out of their hotel room.

As to their daughter M.M., Consuela testified that since the divorce, M.M. had transferred back and forth between the Farmington School District and the Springdale School District. Consuela stated that M.M. is not allowed to drink or smoke marijuana while in her custody but that M.M. had been arrested for having marijuana at school. She explained that M.M. had been sentenced to teen court and that she did not inform Daniel about the arrest. She also noted that M.M. had received in-school suspension for skipping school. Consuela stated that she handled M.M.'s disciplinary issues and initiated and oversaw the transfer process between the schools. She did not discuss the decisions with Daniel. As to their son J.M., Consuela testified that his demeanor has changed since the divorce and that he has gained weight. She noted that "all of this chaos [is not] making him feel secure." She further stated that J.M. cries every time he leaves her house and that going from one environment to the other "disturbs" him.

As to her current relationship with Daniel, Consuela testified that he will not communicate with her. She stated that she had not had an actual conversation with Daniel in almost a year. She noted that when she did see him, he frequently yelled at her. She also admitted that she engaged in yelling and name-calling toward Daniel. She further stated that when the children are in his custody, she cannot contact them. She believed that joint custody is best for the children if she and Daniel could cooperate; but she stated, "[W]e can't, and it's stressful on all of us."

Daniel testified that even though the divorce decree provides that he and Consuela should alternate custody every week, he has the children approximately seventy percent of the time. He noted that when Consuela first moved in with Richard, the children lived

with him more than seventy percent of the time. He testified that since the divorce, he had taken the children to their medical, dental, and orthodontic appointments but that he had not informed Consuela about them. He also noted that since the divorce he had hired a live-in nanny to help with J.M. while he is working.

As to M.M.'s disciplinary issues, Daniel testified that he knew about M.M.'s in-school suspension but that Consuela never informed him about her arrest; he learned about her arrest during mediation. He admitted that even after learning about the arrest, he did not contact M.M.'s probation officer or her attorney and that Consuela had been handling the situation. He also stated that Consuela did not inform him that M.M. had transferred to another school but that M.M. seemed happy with her most recent transfer and that he approved.

Daniel testified that when Consuela had disputes with Richard, she would frequently call him and ask to come back to him. Daniel stated that Consuela and Richard had a pattern: Richard would beat her up, she would call the police and kick him out, and then she would call Daniel. Daniel testified that the children had been exposed to the disputes between Conseula and Richard and that he did not feel comfortable with his children's being around Richard; he described Consuela and Richard as "toxic people." He also voiced concerns about Consuela's alcohol and marijuana consumption. He recalled her stating that she had consumed marijuana in 2015. He further stated that he could not have a civil conversation with Consuela and that he could not coparent with her.

Following the testimony, the attorney ad litem recommended that the court order joint custody. She noted that M.M. had expressed a preference that the parents continue with joint custody but that J.M. did not have the sufficient capacity to make the decision based on his age and emotional instability.[2] The ad litem expressed concern about Richard's returning to Consuela's home after his release from prison, and she recommended that Daniel have an extended summer visitation from June 15 through August 15 and that Consuela should have only weekend visits. The court took the matter under advisement.

On June 14, 2016, the court held a hearing and ruled on the parties' motions. The court found that neither Daniel nor Consuela had established a material change in circumstances warranting a modification of custody and that it was in the best interest of the children for the joint-custody arrangement from the divorce decree to remain in place. The court noted that it had concerns about Consuela and Richard's relationship but found that Consuela should decide whether her house is safe for the children once Richard is released from prison. The court "hope[d] that Consuela acknowledges that [M.M.]'s behavior has improved since Richard hasn't been at the house."

As to Daniel's child-support obligation, the court found the agreement from the divorce decree to be against public policy, and it modified the agreement. Specifically, it imputed Consuela's income to be $26,000 per year with a monthly income of $2,167. Therefore, pursuant to Administrative Order No. 10, it calculated her child-support obligation to Daniel to be $631. The court imputed Daniel's annual income to be

[2]The ad litem met with J.M. on one occasion. She tried to meet with him again, but J.M. was too upset to attend the second meeting.

SLIP OPINION

$398,690 with a monthly income of $33,224. Thus, pursuant to Administrative Order No. 10, it calculated his child-support obligation to be $6,910. The court offset Daniel's obligation with Consuela's obligation. Accordingly, it found that Daniel should pay Consuela $6,279 each month. On June 28, 2016, the court entered a written order reciting its oral findings.

Following the entry of the court's order, Daniel timely filed his notice of appeal. On appeal, Daniel argues that the circuit court erred in finding that he failed to establish a material change in circumstances warranting a modification of custody. In the alternative, Daniel argues that the court erred by modifying his child-support payments, imputing his annual net income to $398,690, and failing to apply the factors from Administrative Order No. 10 that would require a downward deviation from the family-support chart.

We first address Daniel's argument that the court erred in finding that he failed to establish a material change in circumstances warranting a modification of custody. This court performs a de novo review of child-custody matters, but we will not reverse a circuit court's findings unless they are clearly erroneous. *Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Smith v. Parker*, 67 Ark. App. 221, 998 S.W.2d 1 (1999). We recognize and give special deference to the superior position of a circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Sharp v. Keeler*, 99 Ark. App. 42, 256 S.W.3d 528 (2007).

Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Harris v. Harris*, 2010 Ark. App. 160, 379 S.W.3d 8. A judicial award of custody will not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree will be in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that either were not presented to the circuit court or were not known by the circuit court at the time the original custody order was entered. *Id*.; *Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009). Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Grisham v. Grisham*, 2009 Ark. App. 260. The reasons for requiring more stringent standards for modifications than for initial custody determinations are to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. *Id*. The party seeking modification has the burden of showing a material change in circumstances. *Byrd v. Vanderpool*, 104 Ark. App. 239, 290 S.W.3d 610 (2009).

When the parties have fallen into such discord that they are unable to cooperate in sharing physical care of their children, this constitutes a material change in circumstances affecting the children's best interest. *Word v. Remick*, 75 Ark. App. 390, 58 S.W.3d 422 (2001). We have reversed the continuation of a joint-custody arrangement on a motion to modify custody when "there was a mountain of evidence . . . demonstrating that the parties could no longer cooperate in reaching shared decisions in matters affecting their children." *Doss v. Miller*, 2010 Ark. App. 95, at 9, 377 S.W.3d 348, 355; *see also Stibich v.*

*Stibich*, 2016 Ark. App. 251, at 5, 491 S.W.3d 475, 479 (quoting *Gray v. Gray*, 96 Ark. App. 155, 157, 239 S.W.3d 26, 29 (2006)) ("Regardless of whether joint custody is favored, our law remains that 'the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the children's welfare is a crucial factor bearing on the propriety of an award of joint custody, and such an award is reversible error where the cooperation between the parents is lacking.'")

In this case, we hold that the circuit court clearly erred in finding that Daniel failed to establish a material change in circumstances warranting a modification of custody. Both Daniel and Consuela filed motions for modification of custody wherein they asserted that there had been a material change in circumstances since the entry of the divorce decree. At the hearing, both Daniel and Consuela testified that they cannot communicate with each other and that the joint-custody arrangement is not working. Consuela described the circumstances as "chaotic," and Daniel stated that he cannot have a "civil conversation" with Consuela. Further, and most significantly, they testified about the effects of the arrangement on the children. Consuela stated that J.M.'s demeanor had changed since the divorce and that the custody arrangement distressed him. Further, the testimony showed that since the divorce, M.M. had significant disciplinary issues. Moreover, there was evidence that Consuela and her new husband had a volatile relationship that had also negatively affected the children. Given these circumstances, we are left with a definite and firm conviction that a mistake has been made. Accordingly, we hold that the circuit court clearly erred in finding that Daniel failed to establish a material change in circumstances warranting a modification of custody. We reverse the circuit court's award of joint

custody and remand this case to the circuit court for an award of custody consistent with this opinion.

With the custody award reversed and remanded, we do not reach the merits of Daniel's argument concerning the modification of his child-support payments. The issue of child support must also be remanded to the circuit court.

Reversed and remanded.

KLAPPENBACH and VAUGHT, JJ., agree.

*Reece Moore Pendergraft LLP*, by: *Timothy C. Hutchinson*, for appellant.

*Elizabeth Finocchi*, for appellee.

SLIP OPINION