Waymond M. Brown, Judge, dissenting.
Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children.[1] The majority affirms the continuation of joint custody in this case because despite the multitude of issues between the parties, the hostility does not rise to a level serious enough to modify the existing custody arrangement as there is no evidence that the child has been affected. My review of the testimony leaves me to believe otherwise.
Dr. Phillip Pace appeals the order of the Miller County Circuit Court denying his motion to change custody of his daughter, LP. On appeal, Phillip argues that, in light of the discord between himself and Jill Pace, the circuit court erred in continuing the joint-custody arrangement. I agree.
At the time of the parties' divorce in July 2015, Phillip and Jill agreed to share custody of their young daughter, LP. However, in October 2016, Phillip filed the first motion to modify the custody arrangement. Following a hearing in which Jill acknowledged her history with addiction to prescription pain pills and admitted testing positive for cocaine use in a recent court-ordered drug test, the circuit court ordered Jill to submit to further drug testing, yet denied modification.
Phillip filed the second motion to modify custody, which is the motion at issue here, on March 14, 2018. He alleged that there had been a material change in circumstances sufficient to warrant modification of the prior orders and requested that he be awarded primary custody of LP. That same day, Phillip also filed a motion for drug testing, noting Jill's "extended history with substance abuse" and stating that he believed her to not only be using illicit drugs but also to be using them "during periods in which the minor child is under her care and custody."
Following a hearing on the motion for drug testing, the circuit court ordered Jill and her boyfriend to submit to testing. Jill's results were negative for drugs; however, her boyfriend never presented himself for testing. Jill testified that shortly after the hearing, they chose to end their relationship.
A hearing on the second motion to modify custody was held on June 25, 2018.
*293 Following the hearing, the circuit court denied Phillip's request to discontinue joint custody and award him primary custody of LP. He timely appealed the denial of the custody-modification motion.
In reviewing child-custody cases, we consider the evidence de novo, but the circuit court's findings of fact will not be reversed unless they are clearly erroneous or clearly against the preponderance of the evidence.[2] A finding is clearly erroneous when, although there is supporting evidence in the record, the appellate court viewing the entire evidence is left with a definite and firm conviction that a mistake has been committed.[3] We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses.[4]
When the parties have fallen into such discord that they are unable to cooperate in sharing physical care of their children, this constitutes a material change in circumstances affecting the children's best interest.[5] We have reversed the continuation of a joint-custody arrangement on a motion to modify custody when "there was a mountain of evidence ... demonstrating that the parties could no longer cooperate in reaching shared decisions in matters affecting their children."[6] In Acklin v. Acklin , this court upheld the circuit court's finding that the parents' testimony regarding their mutual inability to communicate supported a denial of joint custody.[7] Regardless of whether joint custody is favored, our law remains that the mutual ability of the parties to reach decisions in matters affecting a child's welfare is a crucial factor bearing on the propriety of joint custody and that such an award is reversible error when the cooperation between the parents is lacking.[8]
Here, the testimony clearly established the parents' lack of communication, hostility, and distrust toward one another. Jill is admittedly an addict, and Phillip expressed concerns with her undeniable drug use, as evidenced by a positive drug test and text exchanges between Jill and Niraj Krishna regarding "making it snow." Phillip is equally concerned with the individuals with whom Jill associates and brings around LP, especially the sexual encounters and overnight visitors she has while LP is in her care. Jill testified that she does not trust Phillip as she has discovered voice recorders and GPS trackers in LP's backpack. There has been a CPS investigation, an ER visit, and questionable injuries to LP. There was an incident in which LP suffered a burn to her hand while in Jill's custody, yet Phillip did not ask Jill what happened because "she never tells me anything."
There have been multiple occasions on which the police were called for assistance. For instance, Jill called the police during a heated exchange of LP. From that point on, Phillip was banned from Jill's property and would park on the street and wait for Jill to send LP out instead of picking her up at the door. Phillip's mother called the police another time because she felt that Jill was intoxicated while attempting to *294 pick LP up from her house. Jill left before the police arrived.
Both parties testified to their inability to communicate with one another. For example, when Phillip learned that Jill had acquired roommates, an adult male, an adult female, and their sixteen-year-old son, he immediately hired a private investigator, stating, "I did not call Jill up first ... I did not ask her." Jill specifically testified that she does not trust Phillip and does not communicate with Phillip but with his wife Lacie instead. Phillip also testified that "I'm not really able to communicate with Jill Pace in an adult type manner for the betterment of our four-year-old daughter."
Joint-custody case law bears repeating at this juncture. When the parties have fallen into such discord that they are unable to cooperate in the care of their children, this constitutes a material change in circumstances affecting the best interest of the children.[9] An award of joint custody is reversible error where the cooperation between the parents is lacking.[10] "Discord" is defined as disagreement between people. It is hard to imagine a situation where more discord exists than in the present situation involving calls to police, private investigators, child-abuse investigations, drug use, repeated litigation, and admissions from both parties that they do not communicate with one another. This is not a situation that is conducive to an award of joint custody. I fail to see how this level of hostility and animosity can form the foundation of a workable joint-custody arrangement, where parents must communicate and cooperate with one another on an almost daily basis to coordinate the schedule and needs of their child.
In its order denying Phillip's motion to modify custody, the circuit court found:
The Court finds that it was established by the preponderance of the evidence that Defendant used cocaine on one occasion since the last Order. The Court does not find that such evidence warrants a change in the custody order previously entered in this cause.
The Court further finds the Defendant has met the child's educational needs and most of the other evidence presented was personal in nature and would not have been known by the child or impacted the mother-daughter relationship.
Both parties are required to use due diligence to protect the safety and well being of the child. There was no evidence presented that Defendant's current renters have harmed or would harm the child. Since Sean Lancaster refused to take the court ordered drug test, he shall not have any contact with the child or the Defendant unless he completes the drug testing pursuant to the Order previously entered by this Court. The expense of such drug testing shall be solely that of Defendant and/or Sean Lancaster. If taken, results shall be provided to Plaintiff through his attorney. IT IS SO ORDERED, ADJUDGED, and DECREED.
The Court finds that there has been material changes of circumstances in the lives of both parties since the last order. However, it is not in the best interests of the child to modify the joint custody agreed to by the parties in their Decree of Divorce dated on July 16, 2015. This child should continue to attend Trinity Christian School with Plaintiff paying the full expense unless the parties mutually agree to a change.
IT IS, THEREFORE, ORDERED, ADJUDGED and DECREED that despite *295 the fact that material changes of circumstances have occurred in the lives of both parties, it is in the best interest of the child that the agreed joint custody arrangement between the parties and the agreed child support continue in the July 16, 2015 Decree of Divorce continue [sic].
It appears that the circuit court's findings were based, not on the suitability of joint custody in this particular situation, but on Jill's fitness to parent LP. However, that is not the pivotal question in determining whether to award joint custody. Both parties may be fit parents individually; however, that does not make joint custody appropriate if they cannot communicate. Without communication, there can be no cooperation. Here, the parties testified that they do not communicate, and the record is replete with examples of discord and hostility.
Elizabeth Foster works at Trinity Christian School, which LP attends. She testified that Jill's belief that LP did not need to be in class until 9:00 a.m. is incorrect. Elizabeth stated that instructional time begins at 8:15 a.m.; therefore, when Jill brings LP in late, she misses curriculum. She further explained that she can distinguish between Phillip's weeks versus Jill's weeks by looking at the attendance and sign-in sheets. Elizabeth went on to note that during Jill's weeks LP has had a lunch that did not meet nutritional guidelines, her appearance has been messy, she has been sent to school in inappropriate clothing, appears to be tired, has not had her backpack, and has not had the required napmat, etc. Meanwhile, she noted none of those issues during LP's weeks with Phillip.
Allison Munn, a teacher at Trinity Christian School, has been a preschool teacher for more than eighteen years. She stated that part of her job is to observe parents and their behavior, as parents' behavior can impact a child. Allison explained,
I have had observations of Jill Pace that cause me concern about her having care and custody of LP. There is no consistency as far as parenting, having LP places on time, at school, her behavior at school. Dropping LP off and picking LP up, has been - I don't really know the word - not something that I think needs to be around kids.
Allison provided that she has observed Jill drop LP off at school without the things she needed such as a backpack, napmat, and an adequate lunch. She has overheard Jill tell LP that she will pick her up at 3:00 p.m., but not show up until 5:30 p.m. Allison further commented on Jill's inability to drop LP off at school in a timely manner so as not to miss instructional time. She explained that Jill often looks "disheveled, out of sorts, where she didn't have use of all of her faculties," and she also expressed concern with the people that Jill brings with her to drop off and pick up LP from school.
Allison described incidents of "abnormal parent-teacher conversation" with Jill, including not being involved or showing interest during conferences, text messages stating that Allison was being recorded by Phillip and later changing her story when questioned, contacting her well past acceptable hours, and even telling LP that Allison stole her stuffed hippo "blanky" that she used during nap time. Allison stated that notes would be sent home regarding the things LP needed for school, yet Jill would not provide the items.
LP attended a school function wearing white gloves following the incident in which she burned her hands. When Allison asked what had happened, LP responded that she did not want to talk about it because she did not want to get in trouble.
*296 According to Allison, LP said, "My mommy will be mad if I tell you," which was a "red flag." Allison stated that she was concerned that LP had been "coached" by her mother or grandmother on what to say about the incident.
Allison has observed LP "acting like she was smoking" and heard her talk about cooking breakfast for herself. Additionally, Allison stated,
I have been able to identify when the problems are happening with LP. There is a big difference between when she is with mom and when she is with dad. I see changes in LP's demeanor and behavior in a week when she's with dad as opposed to when she is with mom. Mom's week, she is always exhausted, tired, her behavior is completely different, she is very defiant, very-just-she can even kind of be ugly to some of her friends. You can just tell, it's just kind of moody, I guess. Dad's week, she's you know, not tired at nap time, she kind of flips all around because she's not exhausted. Mom's week, she gets on her mat and she's gone. We don't have as many behavior issues on dad's week, there is more consistency that week, and then the next week you can almost guarantee-and it's not just me that sees it, the other teachers say, oh, well, it must be mom's week. I've noticed this all year.
Based on my observations over the past year I've developed a concern for LP while she has been under the care and custody of her mom. I have developed concerns over LP's educational development. I've developed concerns over whether or not LP is receiving proper nutrition. I've developed concerns over the living arrangements under which LP is being placed. I've developed concerns about her exposure to adult situations. I have developed concerns about the safety and well-being of the child.
Given the testimony, I cannot agree with the majority that it is in the best interest of LP to continue joint custody. It is clear to me that she has been affected by not only the discord between the parents but also by the lifestyle choices of the parents. Children are not unaware of their surroundings nor are they insulated from the choices their parents make. For these reasons, I dissent.
Abramson, Virden, and Gladwin, JJ., join.

Montez v. Montez , 2017 Ark. App. 220, 518 S.W.3d 751.

Hodge v. Hodge , 97 Ark. App. 217, 245 S.W.3d 695 (2006).

Id.

Id.

Word v. Remick , 75 Ark. App. 390, 58 S.W.3d 422 (2001).

Doss v. Miller , 2010 Ark. App. 95, 377 S.W.3d 348.

2017 Ark. App. 322, 521 S.W.3d 538.

Stibich v. Stibich , 2016 Ark. App. 251, 491 S.W.3d 475.

Word, supra.

Stibich, supra.