Cite as 2019 Ark. App. 382

# ARKANSAS COURT OF APPEALS
DIVISION II
No. CV-18-788

| | |
|---|---|
| | OPINION DELIVERED: SEPTEMBER 18, 2019 |
| SAMANTHA CASE (HYDE)<br>APPELLANT | APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT [NO. 43DR-15-887] |
| V. | HONORABLE JASON ASHLEY PARKER, JUDGE |
| ALEXANDER VAN PELT<br>APPELLEE | AFFIRMED |

## ROBERT J. GLADWIN, Judge

Samantha Case appeals the Lonoke County Circuit Court's decision to change joint custody of the parties' two-year-old son to primary custody in appellee Alexander Van Pelt (Alex). Samantha argues that the circuit court erred by entering a default judgment against her and by finding that a material change in circumstances had occurred. Alex concedes that the circuit court's decision was on the merits and that the order was not a default judgment. However, he contends that the circuit court properly found a material change in circumstances and modified custody. We affirm.

I. *Statement of Facts and Procedural History*

Alex filed a paternity action against Samantha in November 2015 alleging that Samantha had given birth to their son earlier that month and that visitation and communication had been denied him since the child's birth. He sought DNA testing and

joint custody. Samantha stipulated that Alex is the father, opposed his request for joint custody, and asked that his visitation be supervised in the beginning.

At the hearing on January 21, 2016, it was revealed that Alex and Samantha had lived together when Samantha became pregnant, but they broke up when Samantha told him she had cheated. A week after she moved out, Samantha moved in with her new boyfriend, Chris Case. Chris had been present when Samantha gave birth, and Samantha admitted that she had done her best to exclude Alex. She said that it would have been reasonable for Alex to believe that she was pregnant with someone else's child. She also said that either her parents or Chris's grandparents watched the child while she worked. She said that she contacted Alex about their son only after he had served her with the paternity action. When asked if the court were to order that she could not cohabit with Chris, she said that she would move out and that it was her plan to move in to her own place.

On February 2, 2016, the circuit court filed a temporary order declaring that Alex is the child's father and ordering joint legal custody with Samantha as the primary custodian. Alex was awarded visitation every other weekend as well as a midweek overnight visit. The order provided that should Samantha use a child-care provider other than her parents, she "shall first give [Alex] or his parents the right of first refusal[.]"

On November 13, 2016, Alex filed a motion for contempt and to modify the temporary order. He claimed that Samantha had violated the order by refusing him the right to keep his son while she was working on November 8 and 9. He further alleged that his hours at Remington were from 7:00 a.m. to 3:00 p.m., and Samantha worked there from 3:00 p.m. until 11:00 p.m. He claimed that he had been keeping their son every day

2

during the hours that Samantha worked since July 5, 2016. He alleged that Samantha would retrieve the child every night at midnight, and he asked that the child be allowed to sleep through the night at his home and be delivered to Samantha in the morning.

Samantha responded with a motion to clarify, stating that she had married and believed that the circuit court had not meant for the right of first refusal to apply to stepparents. She also claimed that her work would change to the day shift in January 2017, and she planned for her new husband to take care of the child during that time. Alex responded with a motion for sole custody.

At the hearing on February 27, 2017, Alex said that instead of moving away from Chris as Samantha had testified, Samantha married Chris in February 2016. Alex said that he had tried to retrieve the child from Chris's grandparents, the Andersons, one night in November 2016 when Samantha had left the child with them while she was at work. The Andersons would not allow Alex to take his child. He claimed that this was in violation of the temporary order. He also complained that Samantha retrieved the child each night at midnight, which Alex felt was not good for the child. He said that Samantha's work schedule had changed since he filed his motion, but she failed to communicate with him or his mother, who had made herself available each day to coordinate visitation exchanges. He alleged that Chris had sent him messages and videos on Facebook that showed his son boxing and the statement, "He's not going to be a punk like you." Alex said that Chris needed to take anger-management classes because he had "bowed-up" at him in the presence of the child. He said that when Chris would deliver the child for visitation, the child's clothes were too small; he was dirty, hungry, and thirsty; and he usually had dirty feet.

Chris said that he had sent Alex messages on Facebook and that he had sent some messages and texts to Samantha's mother that contained foul language and derogatory statements. He admitted that he had written and said some "not-very-nice things." He said that he had been responding to an attack by Samantha's mother and to harassment by Alex, who had been photographing his house. He said that he did not like Alex and did not know Alex or his family. He denied sending the child dirty or hungry to Alex's house. He said that he watched the child during the day from 6:00 a.m. until around 2:00 p.m., when he takes the child to the Van Pelts' house.

At the conclusion of Alex's case, the circuit judge stated in part,

> That's what I do because I don't like rights of first refusal. I don't like them at all, but I didn't like what was going on between the parties then. I don't like what's going on with the parties now. I mean, there's just so much bad blood between everybody involved. And that's [Chris] up there on the witness stand. He's lucky he's not in jail. I get that there's an attitude from everybody involved. I don't know what's going on. I understand [Alex] has issues with [Chris]. I understand that. I understand that [Samantha] has got issues with everybody too. I mean, it's just so much going around. I mean, the only thing I can do is, is that it's apparent that [Chris] has been providing care. Nobody's shown that there's been any problem during this time.
>
> . . . .
>
> Let me finish with my ruling, okay? A kid at this age doesn't need to be taught boxing. But I know a two-year-old goes through stages. I can't say whether it's him or not, but, I mean, teaching a kid to box and hit a bag is not appropriate at that age because a 16-month-old doesn't know the difference between a good hit and a bad hit. I mean, a kid does what a kid is told or shown, and I just don't think [the child] knows at this age what a good hit and a bad hit is. But I'm just telling you from what I've seen and you've put on your case, Ms. Skarda, is I don't see enough there not to let him be a caregiver for the child. I don't know about the Andersons. But at this time, I've got concerns with his attitude on the stand. He thought it was a game. I agree with you. I saw issues with it.

4

Following the hearing, Alex filed a supplemental motion on March 2, 2017, reasserting his request for a change of custody and asking that Samantha be held in contempt and that Chris be declared unfit to provide child-care.

An agreed order was filed on May 30, 2017, stating that the parties had mediated the case on March 6, 2017, and agreed that they would have "true joint custody" of the child, rotating physical custody on a weekly basis. The parties agreed that they would jointly make all major decisions and would engage in good-faith communications. Neither party was ordered to pay child support, and they were ordered to split the cost of the child's health insurance. The parties also agreed to talk privately for five minutes on Sunday evenings. Finally, the parties agreed to participate in coparenting counseling with Randy Walker, and Chris was ordered to participate in counseling with William Scott Loye to work on parenting skills and anger management.

In September 2017, three months after the agreed joint-custody order was filed, Samantha filed a motion to modify custody. She alleged that there had been a material change in circumstances since the agreed order in May that warranted granting her sole custody. She alleged the following:

a.   [Alex] recently moved out of Austin, Arkansas, where he was living just a few minutes from [Samantha], to Sherwood, Arkansas, which is in a different county and a different school district.

b.   That [the child], who will be two years old in approximately two months, is significantly speech delayed, usually uttering just one word at a time and showing an inability to put together sentences. [Samantha] is concerned about this and has considered speech therapy, but [Alex] has been dismissive of the problem.

c.   Additionally, [the child] refuses to eat proper foods, eating mainly chips, crackers and fruit, and no vegetables or proteins. As a result, he is not gaining

5

weight and is exhibiting a failure to thrive. Maintaining joint custody would result in a continued instability for the minor child, and would thwart the development of the minor child.

Alex responded with a counterpetition for change of custody. He alleged that since the entry of the agreed order for joint custody in May 2017, circumstances had significantly changed, making it no longer in the child's best interest for the parties to share joint custody. Alex also filed a contempt motion on November 15, 2017, alleging that Samantha had violated the agreed order by failing and refusing to pay her share of the health insurance premiums covering the child. She responded to the contempt motion on January 29, 2018, stating that she had not paid because Alex had failed to provide any statement or to request a specific amount.

On May 16, 2018, Alex filed a motion for default, alleging that Samantha had never responded to his counterpetition for change of custody and asking that all the averments contained in his motion be deemed admitted. Samantha responded on May 21 claiming that a scrivener's error had been made and that the court should not change custody by default.

A hearing was held on May 17, 2018. Samantha testified that the parties had been exercising joint custody and that the child rotated every Sunday from one parent to the other. When the parties had entered the agreement, Alex and Samantha lived three to five minutes apart. Since the order, Alex had moved to Sherwood, twenty-five to thirty minutes away. She said that she could not exercise joint custody when the child started school in a couple of years. She also claimed that their son had shown some developmental delays in his speech, which was slow to start, and in his eating habits. She said that his speech had

6

improved since the filing of her motion in September 2017, and the record is unclear regarding whether the parties were able to agree to take the child to a speech therapist or whether the issue was discussed. Samantha said that the child would not eat protein or vegetables. She said that he weighed twenty-six pounds, which is about five more pounds than he weighed when she filed the petition. She said that when the child was with her, she made him a plate of food in the morning and tried to get him to eat it throughout the day. She said that she began giving the child PediaSure after she realized that Alex had been giving it to him. She thought that Alex should have told her he was giving PediaSure to the child and that she provided more wholesome food at her house.

Samantha testified that she had a baby on December 18, 2017, and that she left her work at Remington in March 2018 to spend more time with her children. She also said that she had obtained a part-time job on the weekends, Friday and Saturday. She said that her husband Chris watched the children while she was at work. She admitted on cross-examination that she had been working at her new job for the last eight weeks but had failed to talk to Alex about it. She also said that she did not comply with the agreed order between the time the parties had reached the agreement on March 2, 2017, and the time the order reflecting it was filed on May 30, 2017. Samantha could not recall having talked to a doctor about the child's speech, and she admitted that "failure to thrive" was her phrase, not a medical diagnosis. Samantha said that the child's medical records reflect that he had met all the normal milestones for his age and that he had no problems. Samantha said that she had a problem getting the child to eat. She said that she became angry when Alex did not tell her that he had been brushing the child's teeth, and she had not known she should be doing

7

so. On redirect, Samantha said that the agreement for joint custody was largely based on her working on day shift. However, a month after the order was filed, she went back to night shift because that shift offered light duty, which had been necessary for her new pregnancy.

Alex testified that at the time of the mediation for the agreed order, he lived with his parents in Austin and had not known he would be moving to Sherwood. He said that his child did not have poor eating habits, and he introduced a "food log" as evidence of what the child eats. When the doctor told him and Samantha that if there were any concerns regarding the child's nutrition they could offer him PediaSure, he began doing so. He said that he believed his child was a picky eater and did not have issues regarding his eating habits. Alex said that he weighs the child on a weekly basis, and the child normally gains weight the week he stays with Alex and loses weight the week he stays with Samantha.

The circuit court granted Alex's motion to dismiss Samantha's petition to change custody because both parties testified that there was no speech problem, and the testimony and medical records did not support the allegation that the child was failing to thrive.

When the hearing continued on Alex's motion to change custody, Alex testified that he had married since the last order, and he and his wife Kayley had a new baby on March 9, 2018. Kayley stays at home with the children, and she put together the food and activity log that was admitted in evidence. Kayley gets along with the child, runs a structured household, and administers time-outs when necessary. His parents also see the child two to three times a week when the child is with him. Kayley's parents also live nearby and help with both children.

Alex said that his main concern is Samantha's inability to coparent with him. He said that she had always tried to keep him out of the child's life and that her latest motion to change custody was an example of her attempts to do so. He also said that she did not tell him she had gone back to work on the night shift and that he had negotiated the joint-custody agreement based on her working the day shift. He said that Samantha refused to participate in the coparenting counseling ordered by their agreement. He said that Samantha had changed work shifts three times without telling him. He objected to Chris's parents and Samantha's parents keeping the child because they are not clean and they smoke. He said that Samantha had made false allegations in her motion to change custody and that she never told him she had started a part-time job or provided proof of the hours that she works. He also said that Samantha does not interact with his parents, his extended family, or his wife. He said that before the last negotiated agreement for joint custody, Samantha was sometimes cooperative in working with him on the child's schedule. Now, she refuses to communicate with him on the Sunday telephone call, and she will not communicate in person. He said that it is difficult to get information from her about their son. He also said that when their son is brought to him on Sundays, his feet are dirty, he might smell like cigarettes or body odor, or he smells as though they have sprayed him with cologne to cover up the smell. His clothes might be dirty or too small. He said that since the joint-custody agreement, these conditions had gotten worse. Alex said that Samantha had let the child run around naked in her backyard with the dogs for potty training. The child would return from Samantha's house and "pee" on the floor. Alex said that the child is now fully trained and that he would make gains with eating and potty training when he was at Alex's house.

Alex also testified about his son's weight. Alex kept a record each week, and he said he could not recall a time during a specified three-and-a-half-month period that he monitored the child's weight when the child gained weight during his week at Samantha's. He also said that the child would normally gain weight after a week with him. He said that Samantha had complained that the child would not eat and that she could not get him to eat what he was eating at Alex's house. He was concerned that Samantha did not begin brushing the child's teeth without being told, and he was concerned that she would make a plate of food in the morning and offer it to him throughout the day. He also testified about her refusal to participate in coparenting classes with him or to pay her share of the child's health insurance coverage. He stated that Samantha's behavior was willful because she had signed the agreed order that provides that she attend coparenting counseling and pay for half of the child's insurance. He also said that their communication at the visitation exchanges is not meaningful.

Alex's wife, Kayley, testified that she stays at home with her new baby and Alex's son every other week. She said that she kept food logs after Samantha filed her custody motion. She testified about the child's activities and stated that the child speaks in complete sentences and rarely has to be disciplined with time-outs. Alex's mother, Lisa, testified that the child was dirty and wore ill-fitting clothes when he was exchanged for visitations on Sundays. She said that he always needed a bath before he could be taken anywhere. Lisa said that she had been involved with taking care of the child even before the joint-custody agreement had been filed and that after the agreement, Samantha's cooperation and communication worsened. She said that Samantha will no longer speak with her.

10

Samantha testified that she normally gives the child a bath an hour before the custody exchange takes place on Sundays but that there may have been an occasion when there was not time to bathe. She denied dressing the child in clothes that were too small, and she said she and Chris do not smoke and that the grandparents do not smoke around the child. She denied that she allowed the child to run around outside naked, and she said that she had allowed him to do so in the house with his potty chair in the living room. She said she had no reason to believe Alex's testimony that the child gains weight at his house and loses weight at her house and that Alex has never discussed the issue with her. She said that she makes a plate of food in the morning, and she puts it in the refrigerator if the child does not eat it. She will then reheat it for lunch and dinner; or, she may make something different at dinnertime. She said that her part-time job at a steakhouse is on Friday, Saturday, and Sunday morning, and if she does not have the child that week, she might work a couple more days during the week. She agreed that there was a communication problem between her and Alex.

The circuit court granted Alex's countermotion to change custody, finding in part,

> b. There is substantial evidence that since the entry of the last order the parties have been unable to effectively coparent for the benefit of the minor child, and thus the coparenting relationship is broken.
>
> c. Prior orders required the parties to participate in coparenting classes with Randy Walker, and despite [Alex's] attempts to schedule same, [Samantha] failed and refused to participate in the classes.
>
> d. [Samantha] re-opened this case seeking sole custody because she alleged problems with the child's weight, speech, and general development, and further that he had a "failure to thrive." Further, [Samantha] alleged that [Alex] was to blame. This Court finds that [Samantha's] allegations are false, and that the child's medical records established that he was a well-nourished, healthy child, having achieved all normal developmental milestones.

e. However, this Court finds specifically that any perceived issues [Samantha] had with the child's growth and weight gain have been properly dealt with by [Alex], and in [Alex's] home, not in [Samantha's] home. There was some evidence that the alleged speech issue was also taken care of at [Alex's] home, though it was not as compelling as the evidence relating to the weight issue. In any event, this Court finds that [Alex] has been the parent to step up and do what was needed for the child, and has taken better care of the child than [Samantha] has, and he has demonstrated that he is the parent better suited to have custody and control of the minor child going forward.

f. The Court finds that [Samantha] failed to begin giving the child nutrition supplements when she was given this information by the child's pediatrician, and further that [Samantha] did not know to begin brushing the child's teeth once the first teeth started coming in. [Samantha] was angry that [Alex] hadn't told her that he was giving supplements and brushing teeth. There was no evidence regarding whether [Alex] knew that [Samantha] wasn't doing these things, but if he did, he should have told her sooner.

g. This Court finds that the testimony of [Alex], Kaylee Van Pelt, Lisa and Scott Van Pelt is very credible, and finds that the child often is returned to [Alex] unclean and smelling like cigarette smoke.

3. This Court finds that [Alex] is entitled to a default finding of a material change in circumstance because of [Samantha's] failure to respond to that allegation. However, this Court also finds it is not necessary to grant a default on this issue because [Alex] met his burden of proof, and there is overwhelming evidence that circumstances have changed materially since the entry of the last order.

4. Mr. Chris Lacy served as this child's attorney ad litem and after performing a diligent and thorough investigation, he makes the following findings and recommendations: . . . the child has made consistent gains while in the care of [Alex], more than when he is with [Samantha]. Mr. Lacy finds that joint custody is not serving the best interest of this child, and that sole custody should be changed to [Alex] immediately to protect the child's best interest and overall health and welfare. Further, for the ongoing benefit of this child, Mr. Lacy recommends the parties be required to participate together in coparenting classes so they can better communicate for the benefit of the child. . . .

5. This Court finds that this change in circumstances makes joint custody no longer in the best interest of the minor child, and that it is in the child's best interest for sole custody to be granted to [Alex] effective immediately.

From this order, Samantha filed a timely notice of appeal, and this appeal followed.

12

## II. *Standard of Review*

In *Major v. Penney*, 2018 Ark. App. 291, at 11–12, 550 S.W.3d 449, 455–56, we held that

> [a] judicial award of custody will not be modified unless it is shown that there are changed conditions demonstrating that a modification of the decree will be in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to, or not known by, the circuit court when the original custody order was entered. *Grindstaff v. Strickland*, 2017 Ark. App. 634, at 3, 535 S.W.3d 661, 663–64. Generally, to promote stability and continuity in the life of the child and to discourage repeated litigation of issues that have already been decided, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Id.* The party seeking modification has the burden of showing a material change in circumstances. *Id.*

> This court performs a de novo review of child-custody matters, but we will not reverse a circuit court's findings unless they are clearly erroneous. *Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Montez v. Montez*, 2017 Ark. App. 220, at 8, 518 S.W.3d 751, 756. Because the question whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Neumann v. Smith*, 2016 Ark. App. 14, at 12, 480 S.W.3d 197, 204. There are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as those involving minor children. *Id.*

## III. *Default Judgment*

Samantha argues that the circuit court erred by entering a default judgment against her because the decision was based on the merits, rather than by default. *See Tapp v. Landers*, 2009 Ark. App. 289, at 2 (holding that when a judgment is based on evidence presented to the court at trial, as opposed to being based on the failure of a party to appear or attend, the judgment is not a default judgment, and Ark. R. Civ. P. 55 does not apply). Alex concedes that the change-of-custody decision was on the merits rather than a default judgment.

IV. *Modification of Custody*

Samantha contends that the circuit court listed in its order four factors it considered in determining that a material change in circumstances that warranted a modification of the joint-custody order had occurred:

> (1) the parties' failure to coparent; (2) [Samantha's] failure to participate in coparenting classes with [Alex]; (3) [Samantha's] failure to give [the child] nutrition supplements and brush his teeth until she learned that [Alex] was doing so; and (4) allegations that [Samantha] would sometimes return [the child] to [Alex] unclean and smelling of cigarette smoke.

Samantha claims that the circuit court's ruling was wrong for two reasons—(1) the finding of a material change in circumstances was mostly based on conduct by the parties that had been ongoing since before the entry of the last custody order, and (2) any remaining allegations made by Alex did not amount to material changes sufficient to warrant a change in custody.

Determining whether there has been a change of circumstances requires a full consideration of the circumstances that existed when the last custody order was entered in comparison to the circumstances at the time the change of custody is considered. *See Bonds v. Bonds*, 2017 Ark. App. 518, 529 S.W.3d 671; *Geren Williams v. Geren*, 2015 Ark. App. 197, 458 S.W.3d 759. Evidence should be restricted to facts arising since the issuance of the last custody order so that relitigation of factual issues is avoided. *See Myers v. McCall*, 2009 Ark. App. 541, 334 S.W.3d 878. The only exception is when there are circumstances that existed at the time of the previous order but were unknown to the circuit court at that time. *Id.*

14

Samantha argues that Alex did not produce evidence that the failure to coparent or the concerns with the child's condition when he was returned to Alex were "new." She points to the temporary-custody hearing in January 2016 and a separate hearing in February 2017. She contends that the court heard evidence at both these hearings about the parties' inability to communicate and coparent, as well as Alex's allegations that the child was often returned to him unclean and smelling of cigarette smoke. Accordingly, Samantha argues that these two factors cannot be considered material changes.

Samantha contends that the remaining purported changes as set forth by the circuit court are not sufficient to support a change in custody. She claims that her failure to participate in coparenting classes and failure to give the child nutritional supplements or brush his teeth until she learned that Alex was doing so were insufficient to constitute a material change in circumstances. However, Samantha's argument is a mischaracterization of the circuit court's order, which found a change in circumstances based on the parties' inability to coparent under their joint-custody agreement and that their coparenting relationship was "broken."

Alex contends that Samantha failed to preserve the argument that the evidence presented in support of his request for a modification of custody was not materially different from circumstances existing at the time of the prior custody order and could not constitute a material change in circumstances. He cites *Rice v. Rice*, 2016 Ark. App. 575, 508 S.W.3d 80 (holding that a party is bound by the scope and nature of the arguments made at trial). We agree that Samantha did not argue below that circumstances had remained consistent and that, accordingly, custody could not be modified. However, to the extent that

Samantha's argument is aimed at the sufficiency of the evidence, her failure to argue below that circumstances had remained unchanged does not prevent our addressing it. In a civil bench trial, a party who does not challenge the sufficiency of the evidence at trial does not waive the right to do so on appeal. *Bohannon v. Bohannon*, 2014 Ark. 458, 447 S.W.3d 585.

Joint custody requires the parties' ability to coparent. The worsened circumstances as described in the circuit court's order were properly weighed in determining that joint custody could not continue. *See Geren Williams*, *supra* (citing Ark. Code Ann. § 9-13-101(b)(1)(A)(iii) (Repl. 2015) (a parent's pattern of willfully creating conflict to disrupt a current joint-custody arrangement may be considered a material change of circumstances)). The inability to coparent constitutes a material change in circumstances. *Word v. Remick*, 75 Ark. App. 390, 58 S.W.3d 422 (2001); *Doss v. Miller*, 2010 Ark. App. 95, 377 S.W.3d 348; *Montez v. Montez*, 2017 Ark. App. 220, 518 S.W.3d 751. Further, the ability to cooperate in joint custody is crucial, and the failure of the parents to do so constitutes a material change in circumstances. *Zobrist v. Zobrist*, 2010 Ark. App. 537.

The agreed joint-custody order required the parties to participate in coparenting counseling. Alex testified that Samantha refused to participate in the coparenting classes with him. The circuit court, finding Alex to be credible, found that Samantha refused to attend the classes. The parties did not engage in the Sunday afternoon phone call as was ordered in the custody agreement. Samantha agreed that communication between the parties was problematic. The ability of the parties to effectively coparent deteriorated, and the parties could not cooperate with each other in choosing doctors or setting appointments for the minor child, and both parties ultimately filed to modify the joint-custody order.

16

When the parties have fallen into such discord that they are unable to cooperate in sharing physical care of their children, this constitutes a material change in circumstances affecting the children's best interest. *Word v. Remick*, 75 Ark. App. 390, 58 S.W.3d 422 (2001). We have reversed the continuation of a joint-custody arrangement on a motion to modify custody when "there was a mountain of evidence . . . demonstrating that the parties could no longer cooperate in reaching shared decisions in matters affecting their children." *Doss v. Miller*, 2010 Ark. App. 95, at 9, 377 S.W.3d 348, 355; *see also Stibich v. Stibich*, 2016 Ark. App. 251, at 5, 491 S.W.3d 475, 479 (quoting *Gray v. Gray*, 96 Ark. App. 155, 157, 239 S.W.3d 26, 29 (2006)) ("Regardless of whether joint custody is favored, our law remains that 'the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the children's welfare is a crucial factor bearing on the propriety of an award of joint custody, and such an award is reversible error where the cooperation between the parents is lacking.'").

*Emis v. Emis*, 2017 Ark. App. 372, at 8, 524 S.W.3d 444, 450. Based on our de novo review, we hold that the circuit court's determination to modify custody was not clearly erroneous.

Affirmed.

ABRAMSON and WHITEAKER, JJ., agree.

*Taylor & Taylor Law Firm, P.A.*, by: *Andrew M. Taylor* and *Tasha C. Taylor*, for appellant.

*Lightle, Raney, Streit & Streit, LLP*, by: *Jonathan R. Streit* and *Elizabeth M. James*, for appellee.