Cite as 2022 Ark. App. 476

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-19-858

|  |  |
|---|---|
| DAVID KINDER | **Opinion Delivered** November 30, 2022 |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, THIRD DIVISION [NO. 60DR-17-2887] |
| V. |  |
| WENDY KINDER | HONORABLE CATHLEEN V. COMPTON, JUDGE |
| APPELLEE | AFFIRMED |

## BRANDON J. HARRISON, Chief Judge

This is the third time this divorce case has been before our court. In *Kinder v. Kinder*, 2021 Ark. App. 40 (*Kinder I*), we remanded for the trial court to determine whether it had complied with Ark. R. App. P.–Civ. 5(b)(1) when it granted appellant David Kinder more time to file the record. *Kinder I* noted that the trial court's order did not comply with Rule 5 because it did not include the mandatory findings required by the rule. After our remand in *Kinder I*, the trial court held a hearing and issued an order on remand making findings under Rule 5. That brought us to *Kinder v. Kinder*, 2022 Ark. App. 39, 639 S.W.3d 882 (*Kinder II*), wherein our court dismissed the appeal with prejudice for failure to comply with Rule 5. The supreme court accepted *Kinder II* on review, and it vacated that opinion and remanded to our court for a decision on the merits. We now address the merits of David's

arguments as they pertain to the amended divorce decree, and we affirm the amended divorce decree.

This is a highly contentious divorce case between David and appellee Wendy Kinder, his ex-wife. Wendy claimed that David had perpetrated a pattern of physical and emotional abuse against her during the marriage. David, on the other hand, claimed that he had not been abusive to Wendy and that Wendy had habitually lied about the alleged abuse. David also accused Wendy of stealing money from their children's bank accounts and safes during the marriage.

David and Wendy were married in 1994 and have three children—two boys who are now adults and a minor daughter (Minor Child) born in 2006. Wendy accused David of sexually assaulting her (Wendy) at their home on 20 July 2017; she filed for divorce a week later. Because of Wendy's sexual-assault allegation in the criminal matter, a no-contact order was entered that prevented David from contacting Wendy.[1] Additionally, in the divorce proceedings, the trial court entered an emergency custody and restraining order that gave temporary custody of Minor Child to Wendy and prohibited David from contacting Wendy or Minor Child due to Wendy's allegations of physical and emotional abuse.[2] During the divorce proceedings, David was tried for the alleged sexual assault. A jury acquitted him on 8 June 2018.

---

[1]The no-contact order in the criminal case expired a year later by operation of statute. *See* Ark. Code Ann. § 16-85-714(c)(2) (Supp. 2021).

[2]This temporary order evidently remained in effect until the parties were divorced.

2

The divorce hearing was held on March 18 and 19 of 2019; a divorce decree was entered on 25 April 2019. The decree awarded custody of Minor Child to Wendy subject to David's restricted visitation; ordered David to pay child support and alimony; and divided the parties' property.

On 9 May 2019, Wendy moved to clarify and supplement the divorce decree. David filed a response, agreeing that the decree should be amended or supplemented in certain respects. Meanwhile, on June 3, the trial court entered a no-contact order providing that neither party contact the other party except to communicate with respect to Minor Child via the Our Family Wizard app. Both parties were also ordered to stay at least five hundred yards away from the other party except to facilitate visitation exchanges or court-ordered therapy.

On June 13, the court entered an amended divorce decree.[3] The amended divorce decree was like the original decree, and it added provisions for the division of the parties' debt. The amended decree also contained a no-contact order as to David only, with the same conditions previously ordered in the June 3 no-contact order that pertained to both parties. On July 11, David timely appealed the amended divorce decree.

On appeal from the amended divorce decree, David raises four arguments: (1) the trial court erred by ordering only restricted visitation with Minor Child;[4] (2) the trial court

---

[3]The court had jurisdiction to enter the amended divorce decree because Ark. R. Civ. P. 60(a) permits a court to modify a judgment within ninety days to correct errors or mistakes.

[4]The term "minor child" is now required to be used to protect the identity of minors. *See* Ark. Sup. Ct. R. 6–3(b) (revised October 2022) and Rule 6-9 (revised November 2022).

erred by entering a no-contact order; (3) the trial court erred in its award of child support and alimony and in its unequal division of the parties' debt; and (4) the trial court erred in awarding Wendy the assets of a Uniform Transfers to Minors Act (UTMA) account created by the parties' adult son. For the following reasons, we affirm all these points on appeal.

In reviewing domestic-relations cases, appellate courts consider the evidence de novo. *Hass v. Hass*, 80 Ark. App. 408, 97 S.W.3d 424 (2003). We will not reverse the trial court's findings unless they are clearly erroneous. *Id.* A trial court's finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *McKamie v. McKamie*, 2021 Ark. App. 385. In reviewing a trial court's findings, we defer to the trial court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Id.*

At the divorce hearing, Wendy put on witnesses who claimed that, during the parties' marriage, David was manipulative and controlling of her. These included Wendy's mother, sister-in-law, and a coworker.

Wendy testified that she lives in the parties' marital home in Sherwood with their minor daughter, Minor Child, who was twelve years old at the time of the hearing. Wendy maintained that, in addition to David being controlling during their marriage, he was emotionally and physically abusive toward her. She stated that he would beat her and threaten to kill her. Wendy maintained that, even though David was acquitted of the sexual-assault charge, her allegations were true. A criminal investigator testified that, after Wendy reported the sexual abuse against David, the investigator observed injuries to Wendy

4

consistent with the abuse, some blood on the mattress where the abuse was alleged to have occurred, and a windshield scraper that was allegedly used in the assault.

Wendy stated that, since she had accused David of sexual assault and filed for divorce (which was twenty months before the divorce hearing), David had seen Minor Child just twice—once at the attorney ad litem's office and once during a counseling session. The temporary restraining order then in effect prohibited David from contacting Minor Child, although he was permitted supervised contact with Minor Child at Wendy's sole discretion. Wendy testified that she made efforts to facilitate this supervised visitation and "corresponded to David's side that he could do that," but the visits never happened. Meanwhile, Wendy stated that she and Minor Child have a very good relationship.

Wendy asked that any visitation awarded to David be supervised. Wendy admitted that David had never abused Minor Child but stated, "[T]hat does not mean he will not do it." Wendy stated, "I've never seen David be physically mean to [Minor Child]" but that "I am afraid he might do what he has done to me. . . . I am afraid he might hit her, will grab her, and will punch her."

Wendy stated that she has a college degree in speech pathology, although she has never used the degree and has no experience in the field. Wendy works at Simmons Bank and makes $44,000 a year. David is an insurance adjuster for an insurance company, and Wendy stated that she would like his child support to be based on his most recent W-2, which showed an income of more than $100,000. Wendy acknowledged that $32,000 of David's income as reflected on the W-2 was overtime pay, which made his annual income

higher than normal because overtime work is not always available and that David does not regularly work overtime.

Wendy stated that David and their two adult sons had alleged during the marriage that she had repeatedly stolen money from the children's financial accounts. Wendy did not deny making these withdrawals, but she indicated that her name was also on the accounts and that she used the money to pay bills. Wendy was also accused of stealing money from her children's safes, which she denied.[5] There was considerable testimony directly opposite Wendy's on the money point, it bears mentioning.

Wendy also testified that she had attempted suicide three times since 2014. She stated, "I tried to hang myself in the garage when everyone was asleep," and that not long after that, she tried to overdose on her medicine. On the third occasion, Wendy went outside the house while the family was inside and sat on the edge of the deck with a cocked pistol until David found her. Wendy, however, maintained that she has had no thoughts of suicide since separating from David, stating that "it will not happen because I am not under tremendous stress . . . being told that I am stupid or dumb, hit, or punched."

The parties' two adult sons were also called to testify. The older son, Ethan, is twenty-three years old and is a structural engineer. The younger son, Drew, is a twenty-year-old college student. Ethan's and Drew's testimony was consistent. Both testified that they had never seen their father physically abuse their mother, but they had seen their

---

[5]A typewritten letter purportedly written by Wendy and signed by her in May 2016 was admitted into evidence. The letter was written to Wendy's parents, and in the letter, she admitted stealing from the children. The letter states, "I have lied, stolen, caused a lot of pain and agony for everyone in my family." Wendy stated in her testimony that she did not write the letter of her own volition but that David made her write it.

mother physically abuse their father by punching and kicking him. The sons characterized David as a good father who is capable of caring for Minor Child. Both sons stated that throughout the years, Wendy had repeatedly stolen money from their accounts and from their safes. The family would have weekly meetings wherein Wendy would acknowledge that she had taken the money and promise to pay it back by working a second job, although she never paid the money back. Wendy also stole from Minor Child's account, and it was estimated that she had stolen a total of about $20,000 from each of her children. The sons also testified that, after Wendy filed for divorce against David in July 2017, Wendy told them that they were not welcome in her house. This resulted in the sons not being able to see their younger sister, with whom they had a good relationship, for twenty months. The sons would communicate with Minor Child via text. Since the parties separated, David has helped the sons financially, including paying Drew's tuition and college expenses. Wendy, conversely, has given them nothing.

David testified that he has three college degrees and has been a claims adjuster for State Farm for twenty-two years. He stated that the job is stressful and that he has diabetes and high blood pressure. David recently moved to Russellville, where he lives in a two-bedroom, two-bathroom apartment. David stated that he would like to have custody of Minor Child, but that if custody is awarded to Wendy, he wants his child support to be based on his regular salary, which, according to his affidavit of financial means, is $78,000. David acknowledged making significantly more than that in the past year because he had worked extensive overtime but indicated that due to a reorganization in the company, working overtime is no longer allowed.

David corroborated the sons' accounts of how Wendy would steal money from them. According to David, Wendy admittedly stole money from both her sons' accounts and safes. David stated that Wendy would spend the money on herself and would sometimes disappear from the family for days at a time out of remorse without letting them know where she was. David stated that on the occasion that he found Wendy with a cocked pistol in her hand, she had the gun to her face, started crying, and said, "I did it again, I took $6000 out of Drew's safe."

David denied physically abusing Wendy, although he did admit a single incident in 2005 when he slapped her out of frustration because of her consistent lying and deceiving, but only after she had hit him first. He apologized to her. David acknowledged that he did sometimes call Wendy names and that the one time he called her a bitch, she hit him in the back of the head with a frying pan.

David stated that there is no reason why he should not be able to see his daughter. He stated that his recent visit to see Minor Child at the therapist's office went great and that Minor Child gave him a bracelet that she had made for him. David stated that Minor Child is very important to him and that he is willing to go through counseling with her and do whatever it takes to make her more comfortable. David stated that he did not want his visitation with Minor Child to be supervised.

Debbie Scharbor, a professional counselor, also testified. Ms. Scharbor stated that beginning about a month before the hearing, she had met with Minor Child and both parents. Ms. Scharbor diagnosed Minor Child with adjustment disorder with anxiety. She stated that it is evident that the source of Minor Child's anxiety is the strain on the family

8

and not wanting to have to choose between her parents. Ms. Scharbor stated that Minor Child reported that her father yelled at her mother a lot and once threw her up against a counter and hit her, but Ms. Scharbor had no reason to believe that Minor Child had been abused by David.

Ms. Scharbor testified that she has no concerns about Wendy's parenting and that Minor Child feels secure in her mother's care. She stated that Wendy and Minor Child are happy and settled and that Minor Child is a good student and likes her school, her friends, and her routine.

Ms. Scharbor was asked to evaluate the prospects of Minor Child reunifying with her father, and she stated it is a possible goal to reach. She stated that during the counseling session, Minor Child was happy to see David and that they did well together. Ms. Scharbor stated, "I think that time heals all wounds and I just think it's going to be a time process." She stated that "this family is broken and there needs to be a lot of repair." Ms. Scharbor asked Minor Child when she would like to see her father again, and Minor Child said in about a month. Minor Child told Ms. Scharbor that she did not yet feel comfortable being alone with her father or in a public place with him. Ms. Scharbor stated:

> I think [Minor Child] should be free to love both parents in her time frame as she would like. . . . I am confident that I can guide that process. Dad and [Minor Child] did really well in their session. I was very impressed with both of them and their interaction with each other. . . . I would say that they can be reunited in [Minor Child]'s time.

At the trial court's direction, Minor Child's attorney ad litem, Cynthia Moody, prepared a report regarding her recommendations for Minor Child. Ms. Moody reported:

> We find ourselves in a position where David Kinder, having been acquitted of the crime which kept him away from his daughter, now, nevertheless, finds an

9

estrangement of his relationship with her. From the attorney ad litem's perspective, the greater sadness is that [Minor Child] has been deprived of a real relationship with her father during this time and, perhaps, going forward. I believe it is the challenge of the court and the attorney ad litem to help [Minor Child] as the priority—above even her parents' interest—is to come back to a relationship with her father and her brothers in a way that both heals the wounds she feels from the ordeal her family has suffered and avoids inflicting other emotional wounds.

Ms. Moody further reported that Minor Child feels secure in the custody of her mother and views her as the primary caretaker. Ms. Moody stated that Wendy wants Minor Child to have a relationship with David and that she thought Wendy would help facilitate that relationship, although Wendy wanted the visitation to be supervised. Ms. Moody also stated, "I absolutely believe that both parents love [Minor Child] and that she returns that love."

Ms. Moody's ultimate recommendations for Minor Child were as follows:

- Custody to Wendy, subject to David's visitation rights.

- Minor Child to remain in therapy, with both Wendy and David participating, with the goal of reunification of the relationship between Minor Child and her father and brothers in the manner most beneficial and least stressful to Minor Child.

- Under the watchful eye of the therapist, Minor Child should be given "stairsteps" to usual visitation with her father. Perhaps this should begin with daytime only visits in the company of family, which should ease Minor Child into comfort with her father sooner rather than later, with the hope that David can be patient in deference to Minor Child's comfort.

- Eventually, as the therapist feels is the time, Minor Child should see her father at least on alternating weekends and one night per week for dinner. By summer 2020, it seems that Minor Child could spend extended time with her father (weekly increments suggested) unless the therapist sees that this is not good for Minor Child.

- The parties should have the usual division of holidays, with the anticipation that Minor Child will have enough confidence in her relationship with her father by Thanksgiving to have this usual visitation.

Now to the four arguments for reversal.

## I. *Trial Court Erred by Ordering Restricted Visitation*

In the amended decree, the court granted custody to Wendy and ordered that David's visitation would follow the recommendations of the attorney ad litem as stated in the ad litem's report. This meant that, at the therapist's discretion, David would be given "stairsteps" toward regular visitation which, at least initially, would not be the standard unsupervised overnight visitation but would rather be in a family setting. David argues that his visitation with his minor daughter should not have been restricted in this manner.

We have held that the primary consideration regarding visitation is the best interest of the child, and fixing visitation rights is a matter that lies within the sound discretion of the circuit court. *Elliot v. Hale*, 2021 Ark. App. 503. We have also held that child–visitation decisions will not be overturned unless clearly erroneous. *Phillips v. Phillips*, 2014 Ark. App. 486, 442 S.W.3d 901.

David's primary argument as to why he should get unrestricted visitation is that there was no evidence to suggest that he had ever been abusive toward Minor Child. David is correct that there was no evidence that he had abused Minor Child, and Wendy herself admitted that David had never abused Minor Child. But that does not end our inquiry. The attorney ad litem's recommendation of gradually "stairstepping" David's visitation with Minor Child was not based on any suspicion that he might be a danger to her. In fact, the ad litem acknowledged in her report that she had no reason to believe David had abused Minor Child. Rather, the restricted visitation was imposed because David and Minor Child had been separated for twenty months, having had only two brief visits during that time

11

span. Although Minor Child was happy to see her father when they met for the single therapy session, and they by all accounts have a good relationship, Minor Child told the therapist that she was not yet ready to be alone or in a public place with David. Minor Child stated at that time that she would be comfortable seeing her father again in about a month.

It is unfortunate that Minor Child was placed in the position of temporarily losing the relationship with her father due to Wendy's allegations of sexual assault against David, for which David was later acquitted. Regardless, the trial court and this court must be guided by what is in the best interest of the child. And according to both the therapist and the ad litem, it will be best for Minor Child to gradually reunify with her father at a pace she is comfortable with. In David's testimony, he stated:

> I heard the therapist's testimony that [Minor Child] needs more time. I agree with her. We do need to have a little bit more time getting back and also the family. I am willing to be patient and work through the therapy with [the therapist].

Based on the ad litem's recommendation, which the trial court adopted, the court anticipated that it will not take long until David works his way into having regular, unrestricted visitation with Minor Child. Focusing solely on the child's best interest, we hold that the trial court did not abuse its discretion or clearly err in ordering David's visitation with Minor Child to be phased in gradually, incrementally, and therapeutically. Therefore, we affirm the court's findings as they pertain to David's visitation.[6]

---

[6]David also asserts that the trial court's visitation order must be reversed because it failed to make specific findings to support the order. David cites no authority for his claim that such findings were required, and he could have, but did not, file a posttrial motion for specific findings of fact under Ark. R. Civ. P. 52.

## II. *Trial Court Erred by Issuing a No-Contact Order*

David next argues that the court erred in issuing a no-contact order in the amended divorce decree. The no-contact provision in the amended divorce decree provides:

> David shall not contact Wendy in person, by telephone, by texting, by social media, by email, or any other form of communication except as provided herein. David shall not be physically present at Wendy's residence or workplace. David shall stay at least 500 yards away from Wendy at all times, except as necessary to facilitate visitation exchanges or court-ordered therapy. The parties may communicate regarding issues pertinent to [Minor Child] via Our Family Wizard only.

We note that an identical no-contact order was entered separately ten days earlier, which pertained to both parties.

David argues that there is no statutory authority for the trial court to enter such a no-contact order in a domestic-relations case. There are two statutory schemes providing for no-contact orders—one is under the Domestic Abuse Act, Ark. Code Ann. §§ 9-15-101 et seq. (Repl. 2020 & Supp. 2021), and the other is under Ark. Code Ann. §§ 16-85-701 et seq. (Repl. 2005 & Supp. 2021), which contains certain arraignment procedures in cases where a person has been criminally charged with a crime. David is correct that neither of these statutes apply here because there was no pending petition by Wendy for a no-contact order under the Domestic Abuse Act, nor were any criminal charges pending against David when the amended decree was entered. In addition to claiming the trial court had no authority to restrict his contact with Wendy in this manner, David argues that the no-contact order is unnecessary because Wendy testified that she no longer feels threatened by him.

David is correct that the no-contact provision could not be entered under either of the statutory schemes he identifies. Nevertheless, we conclude that no error occurred. This

13

was a provision in a divorce decree that limits the contact between the parties in the interest of postdivorce harmony. Given the obvious animosity between the parties and the allegations that each was abused by the other, we cannot say that the court erred. As stated, there is a no-contact order separate from the amended divorce decree that applies equally to both parties. David's claim that Wendy is no longer threatened by him is not entirely accurate; Wendy said she is no longer threatened by him *because he is no longer around.* David provides no authority that a trial court is prohibited from making such restrictions between divorced parties in a divorce decree, and we affirm this point as not being clearly erroneous.[7]

### III. *Trial Court Erred in Awarding Child Support and Alimony and in its Unequal Division of Debt*

David challenges the court's child-support and alimony awards; and he contests how the parties' debt was allocated.

### A. Child Support

Effective 30 June 2020, Administrative Order No. 10 now considers both the noncustodial and custodial parents' incomes in calculating child support. However, the amended divorce decree now on appeal predated this rule change, so it was for the trial court to determine child support based solely on David's income pursuant to the prior version of Order No. 10. And the trial court endeavored to do so.

In calculating David's income for child-support purposes, the court used his most recent 2018 W-2, which showed gross annual income of $118,000. After taking the

---

[7]David's reply brief argues the 500-yard restriction is excessive because his mother lives within 500 yards of Wendy. But an appellant may not make an argument for the first time in a reply brief. *See Sanders v. Passmore*, 2016 Ark. App. 370, 499 S.W.3d 237.

appropriate deductions, David's net monthly income came to $7021. The court applied this figure to the family support chart and ordered David to pay $994 in monthly child support.

David does not dispute that he earned $118,000 in 2018. He does argue that his 2018 income should not have been used to calculate his child-support obligation because it included a substantial amount of overtime. He testified that overtime is no longer readily available to him and that his present income is less than what is reflected on his most recent W-2. David suggests that his income should instead be calculated based on an exhibit he prepared that purported to reflect his income for four recent biweekly pay periods, which totaled $13,564 gross income and $10,102 net income. Dividing the total net income into four would yield a biweekly income of around $2500 and, when applied to the family support chart, a biweekly child-support obligation of around $365. David says this is what he should have been ordered to pay.

Administrative Order No. 10 requires child-support orders to contain the trial court's determination of the payor's income and recite the amount of support required under the guidelines. *Kirby v. Semeyn*, 2017 Ark. App. 556, 531 S.W.3d 462. The court used David's most recent W-2 to determine his income and then applied his net monthly income to the support chart. David, however, testified that this income included overtime pay that is no longer available to him. But the W-2 was the best information available to the court at the divorce hearing, and the court was not required to find that the eight-week window of income presented by David represented a reliable method of predicting his future income for child-support purposes. As a rule, we will not reverse a trial court's decision regarding

15

the amount of child support absent an abuse of discretion. *Olinghouse v. Olinghouse*, 2022 Ark. App. 114. On this record, we conclude that the child–support award was not an abuse of the court's discretion.

## B. Alimony

The trial court ordered David to pay Wendy $700 in monthly alimony. David challenges the award of alimony, asserting that when this is combined with his monthly expenses he is left with negative monthly income. In fact, Davis claims to have negative monthly income even before assessing the alimony.

The purpose of alimony is to rectify the economic imbalances in earning power and standard of living given the particular facts in each case. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). The primary factors to be considered in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. *Kuchmas v. Kuchmas*, 368 Ark. 43, 243 S.W.3d 270 (2006). If alimony is awarded, it should be set at an amount that is reasonable under the circumstances. *Mitchell v. Mitchell*, 61 Ark. App. 88, 964 S.W.2d 411 (1998). The amount of alimony awarded lies within the sound discretion of the trial court. *Id.*

Based on our review, the alimony awarded by the trial court was reasonable. David clearly has a higher income potential than Wendy. The evidence showed that their most recent respective annual incomes were $118,000 and $44,000. Although David claimed that his expenses leave him with a negative income, it was for the trial court to assess his credibility. *See Chism v. Chism*, 2018 Ark. App. 310, 551 S.W.3d 394. The evidence supported the trial court's finding that David can pay alimony and that Wendy has a current

16

need for it. We therefore hold that $700 in monthly alimony awarded by the trial court was generous in the circumstances—Wendy is arguably underemployed given her education, skills, etc.—but the amount did not rise to an abuse of discretion given the circumstances the court faced with when it made the award.

## C. Division of Debt

The trial court divided the parties' property, including the marital home and their retirement accounts, more or less equally. The trial court also divided the parties' debts, making David responsible for most of the credit-card debt. David argues that the court's allocation of the debt was erroneous, and his primary argument is that no reasons were given for dividing the debt unequally. David's assertion that the trial court was required to make such findings is incorrect.

An allocation of the parties' debt is an essential item to be resolved in a divorce dispute, and it must be considered in the context of the distribution of all the parties' property. *Williams v. Williams*, 82 Ark. App. 294, 108 S.W.3d 629 (2003). A trial court's decision to allocate debt to a particular party or in a particular manner is a question of fact and will not be reversed on appeal unless clearly erroneous. *Id.* It is not erroneous to determine that debts should be allocated between the parties because of their relative ability to pay. *Id.*

Arkansas Code Annotated section 9-12-315 (Repl. 2020) provides that all marital *property* shall be distributed one-half (1/2) to each party unless the court finds such a division to be inequitable, and when property is divided unequally the court must state its basis and reasons for not dividing the marital property equally between the parties, and the basis and

reasons should be recited in the order entered in the matter. But it is well settled that section 9-12-315 does not apply to the division of marital debts. *Williams*, *supra*.

By David's calculations, he was awarded $258,000 in marital assets and assigned $96,000 of the marital debt. Wendy was awarded $273,000 in marital assets and assigned $21,000 of the marital debt. David claims that he has exorbitant monthly expenses that put him at a financial disadvantage. The trial court was tasked with assessing the testimony before it. Both parties received a substantial portion of the marital assets, and David has a greater ability to pay the marital debt than Wendy. We cannot say that the trial court's allocation of the parties' debt was clearly erroneous, though it cannot be said to have been evenly divided, and may not have been what we would have done in the first place.

IV. *Trial Court Erred in Awarding Wendy the Assets of a UTMA Account*

For his remaining argument, David asserts that the trial court erred in awarding the contents of a UTMA account, which was created and owned by their son Ethan, to Wendy. The amended divorce decree provides that Wendy shall be the "custodian" of this account. David asserts that this account was funded by Ethan's own money, that no marital funds were placed in this account, and that Minor Child is designated as the beneficiary in the event of Ethan's death. David contends that this ruling should be reversed because the trial court had no authority to award the account to either parent.[8]

---

[8]In her brief, Wendy correctly notes that she was not "awarded" the proceeds of the account but was only named the custodian. The trial court must have discounted all the testimony from multiple witnesses on how poorly Wendy managed family money, including her children's, to the tune of many thousands, if not tens of thousands, of dollars.

We hold that David lacks standing to assert the violation of his adult son's rights. *See, e.g., Isbell v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 110, 573 S.W.3d 19. Under Arkansas law, to have standing, "one must have an interest which has been adversely affected or rights which have been invaded." *See* 2 David Newbern & John J. Watkins, *Arkansas Civil Practice and Procedure* § 20:4 (4th ed. 2006). Here, David admits that he has no interest in the UTMA account, so he cannot be heard to complain about its disposition. David's point is not lost on us, however. It seems a curious call for the trial court to have given Wendy control over money flagged for her minor daughter's use when much of the testimony went against Wendy on her ability to organize and manage finances responsibly. Yet, we cannot say that an abuse of discretion ultimately occurred on this conflicted record.

## V. *Contempt*

The final issue that we address is the order of contempt against David. After the amended decree was filed, he filed a notice of appeal. The amended decree ordered the parties to divide certain properties and accounts and ordered David to pay alimony and half of the mortgage. Within a few days after the notice of appeal was filed, Wendy filed a motion for contempt, alleging generally that David was not cooperating in dividing the property, failing to pay half the mortgage, and failing to pay all alimony. David denied the allegations. The court issued an order without a hearing, finding that "Mr. Kinder is in willful contempt of the court. I will hold in abeyance his punishment." David then filed an amended notice of appeal and challenged the contempt order.

The issue presented is whether this post–judgment, post–appeal motion and order finding David in contempt and holding his punishment in abeyance affects the finality of the amended divorce decree. We hold it does not.

A contempt matter is between a party and the court, not between the parties themselves. An order of contempt is independent of the merits of the underlying case between the parties. We have held that a finding of contempt is appealable when it finally decides the matter between a party and the court. *Taylor v. Taylor*, 26 Ark. 31 (1998). For a judgment to be final, it must dismiss the parties from the court, discharge them from the action, or conclude their rights to the subject matter in controversy. Here, the controversy was the allegations that David disobeyed certain court orders. The trial court "held in abeyance" any punishment, which means the order did not conclude the matter between it and David, so we will not review it.

VI. *Conclusion*

The amended divorce decree is affirmed in its entirety.

Affirmed.

KLAPPENBACH and HIXSON, JJ., agree.

*Owings Law Firm*, by: *Steven A. Owings* and *Tammy B. Gattis*, for appellant.

*Dover Dixon Horne PLLC*, by: *Adrienne M. Griffis*, for appellee.