Cite as 2025 Ark. App. 543

# ARKANSAS COURT OF APPEALS

DIVISIONS I, II & IV
**No.** CV-24-228

| | |
|---|---|
| | **Opinion Delivered** November 12, 2025 |
| STACY L. BURNS <br> APPELLANT | APPEAL FROM THE PRAIRIE COUNTY CIRCUIT COURT, NORTHERN DISTRICT [NO. 59NDR-23-1] |
| V. | |
| KEATON DILLINGER <br> APPELLEE | HONORABLE CRAIG HANNAH, JUDGE |
| | AFFIRMED |

## BRANDON J. HARRISON, Judge

Staci Burns appeals the circuit court order that found no material change in circumstances sufficient to modify custody and ruled that Keaton Dillinger would retain primary physical and legal custody of the parties' child, MC. She argues that the circuit court erred in not finding a material change in circumstances warranting a change of custody. We affirm the circuit court's order.

MC was born in March 2012. Dillinger filed a complaint for paternity and sought primary custody of MC in April 2013, and in March 2015, the circuit court entered an order establishing Dillinger's paternity and ordering him to pay child support. The order also awarded Dillinger visitation every other weekend and one-half of all holidays. In July 2015, the court entered a temporary order increasing Dillinger's visitation to every other week during the summer.

Fifteen days after the ruling increasing Dillinger's visitation, Burns moved for an emergency suspension of visitation or a change in the visitation schedule. She alleged that transferring three-year-old MC to Dillinger's custody had been a "grueling ordeal," that MC did not want to go, and that MC had begun "bedwetting and acting out since the week long visitations began." Dillinger countered with a motion for contempt and for an emergency change of custody citing Burns's failure to obey the court's July 2015 order by not allowing him contact with MC, not notifying him of illness or health appointments, and disregarding the court-ordered visitation schedule.

On 2 September 2015, the court entered a temporary order granting the parties joint custody of MC with alternating custody periods each week. The order advised both parties to exercise proper conduct, including not making derogatory remarks about the other party and keeping each other informed of matters pertaining to MC. The order also stated,

> The parties shall strictly comply with the custody arrangement and exchange of the minor child as set forth in this Order. If either party violates this Order by failing to deliver the child to the opposing party at the time and location as set forth herein, primary physical custody of the minor child shall be granted to the non-offending party, subject to visitation with the offending party, and the offending party shall be jailed for said non-compliance.

Nineteen days later, on September 21, Burns moved for a change of custody. She alleged that a material change in circumstances had occurred because Dillinger refused to allow phone conversations between her and MC, failed to notify her of changes in his phone's status, failed to notify her of MC's illness, and used a third party on several occasions to communicate information to her about MC. In response, Dillinger again moved for contempt and a change of custody due to Burns's failure to follow the September 2 order by refusing to deliver MC to his custody according to the terms of the order.

2

On 23 October 2015, the court entered an order finding that Burns had willfully failed to abide by the court's order by refusing to deliver MC to Dillinger. Consequently, the court granted custody to Dillinger pending the final hearing scheduled on December 4.

On 12 November 2015, Burns moved to continue the final hearing due to her new counsel seeking discovery and for a temporary visitation schedule. On November 19, she moved to set aside the October 23 order, arguing that her failure to abide by the court's order had not been willful but instead was due to a misunderstanding on her part. The circuit court convened a hearing on November 30 and denied the motion to continue and for temporary visitation.

It is unclear from the record whether the December 4 hearing took place; however, there was a hearing in March 2016, and in an order entered 7 April 2016, the circuit court found that Dillinger was the "more stable parent" and that it was in MC's best interest to be in Dillinger's custody. Burns was awarded visitation every other weekend. The court also ordered the parties to participate in co-parenting and family counseling, with MC participating as requested by the counselor. Finally, the court denied Burns's request to set aside the 23 October 2015 order.

In the fall of 2016, both parties filed motions for contempt alleging that the other party had failed to abide by the court's order. In March 2017, the court ordered the parties to participate in mediation of all issues pending before the court, and in February 2018, the court ordered the parties to attend a coparenting seminar.

In July 2018, the circuit court entered a "final determination on all pending petitions/motions." The court ordered the parties to enroll in and utilize the Our Family

Wizard (OFW) app, which is a co-parenting management tool, and found that unless there is a medical emergency, all communication between the parties pertaining to MC shall take place through OFW. Because the parties had significant, ongoing disputes about MC's medical care, the court designated Dr. Christopher Morgan as MC's primary care physician and ordered the parties to post all doctor appointments on OFW. The court also ordered that MC not be exposed to smoking or transported in a vehicle where smoking has occurred.

In October 2018, Dillinger moved for either termination of visitation or supervised visitation. He alleged that Burns had refused to abide by the court's orders, continually disparaged and harassed him and his wife, failed to provide proper care for MC, failed to follow the visitation and exchange schedule, and continued to file baseless pleadings with the court. He also asked that Burns be held in contempt for failing to comply with the court's orders.

On 10 May 2019, MC's attorney ad litem, Kimberly Eden, moved for an ex parte order suspending Burns's visitation.[1] The motion explained that MC had weekend visitation with Burns on May 3-5, that MC returned from weekend visitation with a "play" first-aid kit that contained a Motrin bottle, and that the Motrin bottle contained two pills identified as tramadol, a synthetic opioid. Eden requested that Burns's visitation be modified to supervised visitation and that overnight visitation be suspended until a hearing could be held for Burns to "explain to the Court and the AAL" how this incident occurred and how "it can be considered anything other than a huge indicator that the child is not safe while

---

[1]MC had three attorneys ad litem over the course of this case—Christina Boyd, Kimberly Eden, and Aimee Lockwood.

in her care and custody." The court entered an ex parte order suspending Burns's visitation that same day.

Burns responded by denying the allegations and asserting that she had inspected the "play" first-aid kit and that the Motrin bottle had been empty. She claimed that the tramadol tablets had been planted by either Dillinger; his spouse, Jessica; or his mother, Shannon. Burns also moved to hold Dillinger in contempt for multiple violations of the court's orders. Finally, she asserted that a material change of circumstances had occurred (namely failure to abide by the court's orders) that warranted modification of the court's 7 April 2016 order.

After a hearing on 21 June 2019, the court entered an order on August 5 allowing Burns supervised visitation and specifically finding that Burns was not credible. Burns filed a notice of appeal from this order but later moved to dismiss the appeal due to lack of a final order.

In July 2020, Burns again moved for an emergency change of custody. She alleged that MC had certain medical conditions that put her at high risk of complications from COVID-19; that Dillinger had "a history of neglecting medical care" for MC and had refused to provide information about MC's medical care to her; and that Dillinger was "taking actions that put [MC's] health in serious medical jeopardy." Burns also asked the court to hold Dillinger in contempt due to these actions.

The court held a Zoom hearing on 10 November 2020 and later entered an order denying Burns's motions for change of custody and contempt. The court found that it was in MC's best interest to not disrupt her schedule. The court warned Burns that she had

been "very reactionary and overreactionary" and warned Dillinger that he "had not done a heck of a good job." The court ordered Dillinger to contact Burns before making doctor's appointments to see if she could attend. The court also found it was acceptable for Dillinger's wife, Jessica, to take MC to the doctor. Finally, the court implemented a "stepped-in" visitation schedule to proceed at the attorney ad litem's discretion.

In December 2021, Burns again moved for the court to hold Dillinger in contempt. She alleged that Dillinger had failed to notify her of medical appointments, that MC had severe nosebleeds due to a reaction to Flonase, that Dillinger had refused to take MC to the doctor regarding her nosebleeds, and that Dillinger had told Burns she could not have visitation with MC over Thanksgiving weekend "because she asks too many questions." Burns also claimed that Dillinger had been "vitriolic" toward her, which indicated that "he cannot follow court orders or coparent." In response, the court again ordered the parties to undergo mediation.

On 23 January 2023, Burns again filed a motion for emergency custody and contempt. She alleged multiple bad acts by Dillinger, including (1) leaving his wife, Jessica, and moving in with his "mistress," Lucy Lott, who has three children; (2) forcing MC to sleep in a bedroom on the floor with these three children, two of whom are boys; (3) exposing MC to cigarette smoke; (4) refusing to communicate via OFW; (5) listening in on Burns's phone calls with MC; (6) leaving MC with Lott or his mother while he works "from before sunrise to after sundown as a farmer"; (7) refusing to take MC to the doctor when she had been ill for up to five days with fever and vomiting; and (8) engaging in domestic violence when MC was in the home. She also alleged that Lott was a known drug

6

user and was facing eviction. Burns asserted that MC was in danger and asked for permanent custody of MC.

The court set a hearing for 27 July 2023, but before the hearing could be held, Burns filed another motion for contempt on June 7. The motion alleged violations of the court's orders committed by Dillinger, including failing to follow the summer visitation schedule, failing to communicate or respond as ordered, and withholding phone calls between Burns and MC.

At the hearing on July 27, Dillinger testified that he lives in Hazen, Arkansas, and works as a diesel mechanic. His hours vary, but he generally works around sixty hours a week. He usually finishes work between 5:00 p.m. and 7:00 p.m., and he also has free time during the day in between service calls. During the summer, his mother takes care of MC while he is working. He acknowledged that in his recent divorce, he agreed that his ex-wife would have primary custody of their son because of his work schedule, although he said he agreed only because he did not want to "argue about the situation" and because he "can't fight two people at one time." His current girlfriend, Lott, did not live with him but stays with him when his kids are not there. Lott also took MC to the doctor once and signed his name with his permission. He said Lott was not obligated to mention MC's mother in that situation; "What's she going to do? She's in Mississippi." He had known Lott for several months before she met MC; however, he had also dated a woman named Brandy Pate and introduced her to MC after knowing her about a week and a half.

Regarding communication with Burns, he had used OFW "[t]o a certain extent" but not always. He explained that "it got to where [Burns] was just sending [messages]

7

constantly. I was handling it over the phone. And she went to the app every time." However, he said he had complied with the court's order to allow telephone contact between Burns and MC.

Dillinger acknowledged that he came across as "mean" toward Burns at times but explained, "I mean, it's a known fact I don't—we don't get along. That's why we're not together anymore. So, I mean, I'm not going to hide it or act like I like her or anybody else." He also said he was not trying to be mean but "it just comes out like that," and "[t]his has kind of been going on for a long time." He also acknowledged berating the ad litem and telling her that she is a "biased one-sided piece of shit."[2] He denied ever getting angry at MC and speaking to her in that manner.

Dillinger agreed that he sometimes asked eleven-year-old MC to deliver a message to Burns because "[MC] has a lot better relationship with [Burns] than I do." When asked if he had helped further the relationship between Burns and MC, he said, "I don't have anything to do with that. That's their relationship. I stay out of it." He also said that when Burns asks for extra time with MC, she usually gets it. He agreed that when he was married, Jessica did some of the communicating with Burns via OFW. He had also gotten a new phone and forgot to download the OFW app.

Dillinger's ex-wife, Jessica, testified that in her divorce from Dillinger, she had been awarded custody of their son due to Dillinger's long, unpredictable work hours. She also stated that she had communicated with Burns via OFW if Dillinger was unavailable because

---

[2]Dillinger was later questioned by the ad litem, and he apologized for the names that he had called her.

of work or if the situation dealt with "maybe a school assignment" or something like that. There were also times that she took MC to the doctor because Dillinger was working. According to Jessica, Dillinger thought she had been in contact with Burns, and before the hearing, he told her that if she testified she would be charged with stalking. Jessica was worried that the situation may cause their son and MC to spend less time together.

Jessica stated that there had been "a lot of communication issues" between Dillinger and Burns. He became angry when dealing with Burns, but that anger was not directed at her or MC. On cross-examination, Jessica said that Dillinger has been a good parent to their son and to MC. She described the ongoing litigation with Burns as "hell." She acknowledged that she had seen Dillinger smoking around MC within the past year.

Dillinger's mother, Shannon, testified that MC had been mostly in her care during the week over the past summer but that they visited Dillinger several days during the week. MC also stays with Dillinger on the weekends along with her half brother. Shannon said that Burns will not talk to her, so MC told Burns about a week-long trip to Florida with her grandparents earlier that summer. But Shannon also acknowledged there was a text message exchange between her and Burns that occurred on the way back from Florida regarding when MC would arrive home.

Burns testified that she lives in Hernando, Mississippi, with her husband. She has an eight-year-old stepson who is there when her husband has visitation, and MC is there when she (Burns) has visitation. Her mother, sister, brother, and sister-in-law all live close by, and MC is close with her family. Burns said she had not been involved in MC's medical care because Dillinger did not make her aware of doctor's appointments. She also said that

if Dillinger was not able to take MC to the doctor, she would have driven the two hours to take MC to the doctor because Lott did not know enough about MC's medical history. Burns claimed that MC is allergic to cigarette smoke and that it causes her eyes to "whelp up" and that she has trouble breathing.

Burns explained that she wanted full custody so she could be the one making decisions for MC. She did not believe joint custody was possible due to Dillinger's work schedule. Burns works as a respiratory-care practitioner and can set her own hours. Her husband and sister are also available if she needs help with MC. Burns said that she talks to MC every day and that every time she had talked to MC that summer, MC had been at Shannon's house. She also said it was inappropriate for MC to relay messages for Dillinger or his mother and that doing so made MC feel "nervous" and "scared." Burns said that Dillinger chose to quit using the OFW app and that he had gotten angry and cussed at her as recently as the past week. She expressed concern that if MC remains in Dillinger's custody, her relationship with MC will deteriorate and eventually become nonexistent.

On cross-examination, Burns agreed that she had filed numerous contempt motions throughout the pendency of this case but claimed to not remember whether Dillinger had ever been held in contempt. She denied that she was still raising the same issues and said, "[W]e have not litigated the stuff that has happened since December." Burns acknowledged that she was seeking to move MC from Arkansas to Mississippi and that MC makes great grades at her current school.

Upon questioning by the court, Burns said that Dillinger was not meeting MC's medical needs because he did not give her medication and also gave her medication not

10

meant for her. She admitted that the issue with the wrong medication happened before the last hearing. She also said that Dillinger does not send MC's medication with her for visitation, but she later acknowledged that she had no evidence of a prescription for MC that she had not received. When asked what significant changes had occurred since the Zoom hearing in 2020, Burns said Dillinger had left his wife and moved all of MC's things out of the home he shared with Jessica. She said MC had been greatly affected by the split between Dillinger and Jessica and is often "distraught." Upon further questioning by her attorney, Burns stated that according to the Life-360 app installed on MC's phone, she had stayed overnight at Lott's house over ten times. She also said Dillinger had not followed the court's 2020 order to inform her of all doctor's appointments.

Lott testified that she is Dillinger's girlfriend and that MC had stayed at her house a few times and slept in Lott's daughter's room. (Her daughter was not at home at the time.) Lott's two boys, ages five and three, were also there and slept in their own room. Lott had driven MC to and from school numerous times and to the doctor's office once. She was unaware at the time that there was a court order establishing MC's primary care doctor and preventing Dillinger from having MC overnight at her house. She admitted driving more than thirty miles over the speed limit with MC in the car on at least one occasion. Lott described Dillinger as a great dad and MC as a happy child.

Shannon was recalled to the stand and testified that she loves MC and had spent a lot of time with her throughout her life. Shannon's husband, Allen, also spends time with MC. She described Dillinger as a great dad. Shannon said she and her husband have a strong relationship with MC and that it would be detrimental for MC to move to Mississippi. She

11

was concerned that MC would "have a nervous breakdown." On cross-examination, she agreed that a great father would communicate with his child's mother and respond to her questions. She was surprised to learn that Dillinger does not respond to Burns's messages about MC. She also did not know that Dillinger had violated the court's orders by taking MC to a different physician. But she said that communicating with Burns is "terrible."

Dillinger was recalled to the stand and testified that MC is doing well in school and that he helps her with her school-work. He also explained that outside of his problems with Burns, he did not have a problem communicating with or being mean to other people. He felt harassed by Burns and it had been like that for years. He admitted that the overnight visits at Lott's house had happened a couple of times and understood that it should not happen again. He also acknowledged that MC should see Dr. Morgan but explained that the one time she saw a different doctor, Dr. Morgan was out of the office and he (Dillinger) did not want to wait. He reiterated that he did not usually communicate by calling people names but admitted calling Jessica "trash" or "garbage" after her testimony. Finally, he agreed that he loves MC, thinks he does a good job of taking care of her, and wants the litigation to stop.

After the testimony concluded, the attorney ad litem, Aimee Lockwood, shared her recommendation with the court. She described MC as "a wonderful kid, very smart, very nurturing, very talented, athletically gifted, very social. She loves both her parents." MC told Lockwood that she always has her own bed at her father's house and has not been in danger. However, MC does not like feeling like she is "in the middle" and "wants to be able to focus on school and her friends and her relationships." She does not want to be in

12

a position of choosing between her parents. Lockwood expressed concern about MC's being around any new romantic interest of her father because it can be inconsistent and confusing for a child. She also stated that Dillinger did not have "a great deal of integrity at this point" and that "those moral-fitness factors are making it difficult for him to parent and coparent his daughter." She continued, "I know he loves [MC]. [MC] loves him very much. And [MC] reassures me that she has not been neglected in his care. But I don't know that that's enough, Your Honor."

The circuit court found Dillinger in contempt for his behavior toward Lockwood and for willfully disobeying the court's order about overnight guests and communicating through OFW. The court then stated,

> For me to change custody, I have to find two things: there has to be a significant change in circumstance, and then there has to be—it has to be in the best interests of the child. Almost all of the testimony today concerned bad behavior between the adults. I didn't hear much about your daughter other than she is very smart, apparently a very good kid, does very well in school, and I didn't see much evidence that any of this behavior between the adults spilled over onto her, that she had been adversely affected yet. But I don't know how it hasn't. This has been going on since 2013, and it has got to stop.

> Based upon the testimony and evidence presented today, I find that there has not been a significant change of circumstance and there has not been enough credible evidence to find that it would be in the best interest to change custody at this time.

The court's written order confirmed that Dillinger would retain primary physical and legal custody and that Burns would have standard visitation as set out in the order.[3] Burns filed a timely notice of appeal from the court's order.

We perform a de novo review of child-custody matters, but we will not reverse the circuit court's findings unless they are clearly erroneous. *Hamerlinck v. Hamerlinck*, 2022 Ark. App. 89, 641 S.W.3d 659. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Id.* In reviewing a circuit court's findings, we defer to the circuit court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Kinder v. Kinder*, 2022 Ark. App. 476, 655 S.W.3d 880. Deference to the circuit court is even greater in cases involving child custody, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the child. *Fudge v. Dorman*, 2017 Ark. App. 181, 516 S.W.3d 306.

A party seeking to change custody bears the burden to establish that a material change in circumstances has occurred since the last custody order and that a change in custody will be in the best interest of the child. *Hart v. Hart*, 2013 Ark. App. 714. Courts impose more stringent standards than they do for initial determinations of custody in order to promote stability and continuity in the life of the child and to discourage the repeated litigation of

---

[3]The court's order contained a scrivener's error in that "plaintiff" (Dillinger) retained primary physical and legal custody, and "plaintiff" (meaning Burns) was awarded visitation as set out in the order. The court later entered an agreed order correcting the references to Burns to read "defendant."

the same issues. *Geren Williams v. Geren*, 2015 Ark. App. 197, 458 S.W.3d 759. In order to change custody, the circuit court must first determine that a material change in circumstances has occurred since the last custody order; if that threshold requirement is met, it must then determine who should have custody, with the sole consideration being the best interest of the children. *Id.*

Determining whether there has been a change of circumstances requires full consideration of the circumstances that existed when the last custody order was entered in comparison to the circumstances at the time the change of custody is considered. *Geren Williams*, *supra*. Failure of communication, increasing parental alienation by a custodial parent, and inability to cooperate can all constitute a material change in circumstances sufficient to warrant modification of custody. *Montez v. Montez*, 2017 Ark. App. 220, 518 S.W.3d 751. Further, we have held that the combined, cumulative effect of particular facts may together constitute a material change. *Shannon v. McJunkins*, 2010 Ark. App. 440, 376 S.W.3d 489.

Burns initially argues that the circuit court erred in not believing MC had been negatively impacted by Dillinger's poor conduct or his changed conditions since his divorce from Jessica. She contends that the circuit court need not wait until a child is actually harmed before finding that a material change in circumstances warrants a change in custody. *Ledoux-Syrock v. Ledoux*, 2024 Ark. App. 533, 701 S.W.3d 1.

Next, Burns asserts three reasons why the circuit court should have found a material change in circumstances. First, the evidence showed that Dillinger cannot take care of MC because of his work schedule. He testified that he did not have regular work hours, and he

15

had relied on his ex-wife to take MC where she needed to go. He now relied on Lucy Lott to take MC to school and pick her up from school, and Lott had taken MC to the doctor as well. In addition, Dillinger admitted that his work schedule made it impracticable to share joint custody of his son with his ex-wife. Burns contends that Dillinger's divorce from Jessica, and his inability to rely on Jessica as MC's primary caregiver, constitutes a material change in circumstances.

Second, Burns argues that Dillinger's behavior shows that he is not morally fit to care for MC. He is mean to Burns and also used offensive and disparaging language toward the attorney ad litem. Also, Dillinger said on the stand that he had not "cohabitated" with Lott when MC was present, but Lott testified that he and MC had stayed at her house overnight on two occasions. Finally, he admitted that after Jessica's testimony, he had called her "trash" or "garbage" outside the courtroom.

Third, Burns asserts a material change has occurred because Dillinger cannot conform his conduct to the law and follow orders. He committed multiple violations of court orders, including failing to use OFW to communicate with Burns, letting a third party take MC to the doctor, using MC to relay information to Burns, and cohabiting with his girlfriend. Burns stresses that a parent's past action is a good indicator of future conduct, *Hanson v. Hanson*, 2023 Ark. App. 363, 676 S.W.3d 8, and that Dillinger "is who he is and can't change."

Custody awards are not made or changed to punish, reward, or gratify the desires of either parent. *Powell v. Marshall*, 88 Ark. App. 257, 197 S.W.3d 24 (2004). Further, a violation of the circuit court's previous orders does not compel a change in custody. *Id.*

16

The violation is a factor to be taken into consideration, but it is not so conclusive as to require the court to act contrary to the best interest of the child. *Id*. We have said that even when a custodial parent willfully violates court orders, modification is not necessarily warranted because a court's contempt powers should be used before the more drastic measure of changing custody. *Geren Williams*, *supra*. Finally, petty complaints and parental gamesmanship may not rise to the level of a material change in circumstances, especially if the child is left relatively unscathed. *Hart*, *supra*.

Here, the circuit court found that the testimony demonstrated "bad behavior" between the two parents but that MC had not been adversely affected. The evidence demonstrated a change in Dillinger's circumstances in that he was no longer married to Jessica, but the court found no material change had occurred, and the court's oral ruling indicated that it would not be in MC's best interest to change custody. The court also took Dillinger's violation of the court's orders into account and exercised its contempt powers to punish Dillinger's noncompliance. After a de novo review, we are not left with a definite and firm conviction that a mistake has been made.

Affirmed.

ABRAMSON, GLADWIN, THYER, and BROWN, JJ., agree.

TUCKER, BARRETT, HIXSON, and MURPHY, JJ., dissent.

**CASEY R. TUCKER, Judge, dissenting**. The majority makes the mistake of delving into the full history of this case. This could well be the basis for its error in concluding that there has not been a material change of circumstances since the entry of the last custody order. In reviewing a change-of-custody case, this court considers only what

17

has occurred since the issuance of the most recent custody order. *Redman v. Redman*, 2024 Ark. App. 562, 701 S.W.3d 40; *see also Case v. Van Pelt*, 2019 Ark. App. 382, at 15, 587 S.W.3d 567, 576 ("Determining whether there has been a change of circumstances requires a full consideration of the circumstances that existed when the last custody order was entered in comparison to the circumstances at the time the change of custody is considered."). In *Redman*, this court further explained:

> We look at whether there has been a material change in circumstances since the issuance of the last order of custody. Failure of communication, increasing parental alienation by a custodial parent, and inability to cooperate can all constitute a material change in circumstances sufficient to warrant modification of custody. Further, we have held that the combined, cumulative effect of particular facts may together constitute a material change.

2024 Ark. App. 562, at 11–12, 701 S.W.3d at 46 (citations omitted).

The analysis in this case, when done correctly and in keeping with precedent, would start at the time of the issuance of the last custody order entered immediately prior to the one currently on appeal; recognize that failure to communicate, increasing parental alienation by the custodial parent, and the inability to cooperate can all constitute a material change in circumstances; and recognize that the combined effect of certain facts can constitute a material change. Viewing this case in light of our precedent, as this court is bound to do, I would find that a material change in circumstances occurred and reverse and remand for the circuit court to consider who should have custody of MC, based on the best interest of the child. Thus, I respectfully dissent.

The last custody order entered before the one that is now before us dates to November 2020 following Staci's motion for emergency change of custody, which the

Circuit Court of Phillips County denied.[1]  At the time of the 2020 custody order, Keaton was married to Jessica Dillinger.  The court cautioned Staci about being "over-reactionary." The court also cautioned Keaton that he had not done a "heck of a good job."  The court ordered him to notify Staci in advance of all medical and dental appointments to give her the opportunity to attend.  It also ordered Keaton not to let anyone other than himself or his wife, Jessica, take MC to the doctor when MC was in his care and ordered that no one smoke in MC's presence.

In January 2023, Staci filed a motion for emergency custody and contempt, the partial denial of which is the subject of this appeal.  The hearing on Staci's motion for change of custody was held on July 27, 2023.  The evidence was that Keaton and Jessica had finalized their divorce approximately a month earlier.  Keaton had agreed to give up joint custody of the son he shared with Jessica in favor of Jessica having full custody, due to his work schedule.[2]  He testified that his hours fluctuated, but at the time of the hearing, which took place on a Thursday, he had already worked sixty hours that week.  Keaton's mother, Shannon Dillinger, was caring for MC during the summer due to Keaton's long and unpredictable hours.

In the wake of his separation from his wife, Keaton had had three romantic interests, two of whom he had introduced to MC.  And the court found that Keaton had violated court orders by having MC present when he spent the night with his new girlfriend, Lucy Lott.  Possibly more troubling, Keaton allowed MC to ride in Lucy's car with her, and Lucy

---

[1]The written order was not filed of record until May 10, 2021.

[2]Keaton lived approximately only one mile from Jessica.

frequently drove MC to school. Lucy admitted that she had driven approximately thirty miles over the speed limit with MC in her car when she had been running late.

It is undisputed—and the court found—that Keaton had violated the circuit court's orders with regard to MC's medical care. The court had previously ordered Keaton and Staci to use Christopher Morgan, MD, as MC's primary care physician, but Keaton failed to consistently use that doctor. Keaton failed and refused to notify Staci of medical and dental appointments in violation of court orders. Keaton allowed Lucy to take MC to the doctor in violation of court orders. In fact, with Keaton's permission, Lucy completed a HIPAA form that listed Keaton, Shannon, and Lucy as the people with whom MC's medical information could be shared, neglecting to list Staci.[3] When asked about this on cross-examination, Keaton testified that he did not have to include Staci in the medical paperwork, stating, "If the doctor don't ask, why tell him?" and "[i]t doesn't matter. I'm her father."

Keaton violated the court's prior orders regarding communicating with Staci. He admitted that at one time, he had used the mobile app Our Family Wizard (OFW) to communicate with Staci, as ordered by the court, but that he had stopped doing so and refused to resubscribe to the app. When he did use OFW, he was less than civil; for example, he once stated to Staci:

> Did you find everything you were digging for at [MC's] school this morning? Why exactly do you harass me, the eye doctor, her doctor, the school? What are you looking for? Everyone associated with [MC] thinks you're absolutely

---

[3]In order to comply with the court's order, the form should have included only Keaton and Staci (and Jessica, prior to her divorce from Keaton).

nuts. Just do everybody a favor, sit down and chill out, because what you're doing ain't working.

At trial, Keaton testified that he thought this was an appropriate way to respond to MC's mother who was trying to obtain information about her daughter. Staci and Keaton's communications are replete with Keaton's being unnecessarily combative, controlling, and childishly uncooperative.[4] Further, he failed to use OFW to keep Staci apprised of events, such as an out-of-state overnight field trip; an awards program at which MC was receiving an award; and a Florida vacation MC was taking with Shannon. The exhibits are laced with Staci's requests for school and medical information as well as contact information for coaches and instructors. Keaton acted as the information gatekeeper, rarely opening the gate. And, he admittedly used MC as a messenger to communicate with Staci, stating, "She has a lot better relationship with her than I do."[5]

In *Montez v. Montez*, 2017 Ark. App. 220, 518 S.W.3d 751, this court reversed a circuit court's failure to find that a father had proved a material change in circumstances warranting a modification of custody. In doing so, this court stated that when "the parties have fallen into such discord that they are unable to cooperate in sharing physical care of their children, this constitutes a material change in circumstances affecting the children's best interest." *Id.* at 9, 518 S.W.3d 751. *Montez* was a case in which the parents had joint custody, but the same principle—that inability to cooperate can constitute a change of circumstances—applies to the case at bar.

---

[4]By contrast, Staci's communications show remarkable restraint.

[5]Shannon also admitted that she used MC as a messenger with Staci.

21

In *Wallis v. Holsing*, 2023 Ark. App. 137, 661 S.W.3d 284, the trial court modified custody from the father having primary custody to the parents having joint custody, and this court affirmed. The child in *Wallis* was well rounded, excelling in school, and outwardly appeared to be unaffected by the parties' divorce. However, the attorney ad litem opined that the father was a bit controlling, could be abrasive, and had to have things his way. She thought the child's anxiety level was extremely high. The circuit court found that there was a material change in circumstances regarding the parties' interactions and communication since the divorce decree. It acknowledged that the parties had always experienced communication issues, but the mother had matured and was doing better, while the father was causing a communication breakdown and was not listening to the mother's reasonable requests. In sum, the circuit court found that the father had "gone overboard" in attempting to not coparent with the mother. Affirming, this court stated, "Failure of communication, increasing parental alienation by a custodial parent, and inability to cooperate can all constitute a material change in circumstances sufficient to warrant modification of custody. Further, we have held that the combined, cumulative effect of particular facts may together constitute a material change." 2023 Ark. App. 137, at 5, 661 S.W.3d at 288.

In the present case, MC outwardly appears to be doing well even in the midst of her parents' tumultuous relationship. As in *Wallis*, the parties have always experienced communication issues, and the record demonstrates that Staci has matured and is doing better, while Keaton is refusing to communicate reasonably and will not even consider or civilly discuss Staci's reasonable requests. For example, he unilaterally gave MC permission

22

to go to her first dance, which occurred during the first hours of Staci's weekend visitation. Staci requested that she be allowed to make up those hours by picking MC up from school and getting her ready for the dance, which MC had requested. Keaton refused, stating that Shannon would help MC get ready, and Staci could have her after the dance. Likewise, Keaton refused to tell Staci in advance when she could have MC for Christmas so that Staci could make plans. He also refused to discuss splitting a four-day Easter weekend with Staci, even though Staci had not spent Easter with MC in years. As in *Wallis*, Keaton has "gone overboard" in his efforts to not coparent with Staci.

Keaton interfered with Staci's visitation time. In addition to the previously discussed dance, Keaton or Shannon signed MC up for softball to include practices and games during Staci's parenting time without consulting with her. Keaton refused to allow Staci to have MC for Thanksgiving one year because, he said, Staci asked too many questions. When Shannon took MC to Florida, Shannon directed MC to tell Staci they would be returning a day late due to car trouble, cutting into Staci's visitation time. Then Shannon refused to speak with Staci directly, instead telling her to contact Keaton, who was not on the trip. When Staci asked where Keaton was, Shannon responded with a shrug emoji. Throughout the case since the last custody order, Keaton has refused—and allowed Shannon to refuse—to respect Staci or her visitation time and refused to work with Staci on reasonable requests.

Keaton made unsupported, disparaging remarks about Staci, her husband, and her family. At the hearing, he admitted that he referenced Staci and her husband smoking a blunt when he had no evidence that they ever did so. He admitted that he was just being

mean. He testified that it was a known fact that he and Staci do not get along, so he was not going to hide it or pretend that he likes her.

Keaton did not limit his inappropriate communications to Staci. Admittedly, he blasted MC's attorney ad litem (AAL), stating, "You are a biased one-sided piece of shit." His written message to the AAL continued,

> You have been for Staci Burns since day one. It's never been about what's best for [MC], and if you think stripping custody from me, where she's happy, has straight A's in school, and makes it to school every day, to put her in Mississippi around her crack-headed grandparents where she will be probably molested and mentally abused, then you are the deranged psycho I always thought you were.
>
> . . . .
>
> As for all the lies you have put in the motion, good luck proving what you think you know just because somebody has told you a rumor. I will say this again, so put your bifocals on and push them closer to your fat-ass head, I don't have a mistress or a girlfriend. Maybe this time it will sink in.
>
> . . . .
>
> And I will see you in court. Oh, and I noticed that you are handicapped. If you need help getting into the -- getting to the courtroom, I'm sure Kerry Burns can help you get there, and you probably need to sit with them. Thank you and have a nice day or don't. I don't give a fuck either way.

Keaton testified that he was angry at the time he wrote the message to the AAL and that being angry justified the way he spoke to her. He never apologized and did not show remorse at trial, stating, "I mean, if the shoe fits."

Jessica testified that Keaton had threatened her that he would file stalking charges against her if she testified. Jessica did not like the way Keaton treated and communicated with Staci, saying that he would become angry and curse. Keaton admitted that after Jessica

24

testified, he called her a "trashy bitch" in the hallway of the courthouse and told her she was nothing but trash.

"This court has found a 'material change in circumstances' to exist on the basis of uncooperative behavior, communication failures, increasing alienation by a custodial parent, and inability to coparent." *Alsina v. Hicks*, 2023 Ark. App. 485, at 5–6, 678 S.W.3d 449, 453 (citing *Wallis v. Holsing*, 2023 Ark. App. 137, at 5, 661 S.W.3d 284, 288). The present case is akin to *Alsina*, in which this court affirmed the circuit court's decision to modify custody due to the mother's trying to cut the father out of the child's life by failing to keep him apprised of appointments and milestones. Applying *Alsina* to these facts, it is clear there was a material change in circumstances between the issuance of the last custody order and the order that is before us. The record is replete with unanswered messages from Staci to Keaton, evidence of missing medical and school information and notifications, and refused phone calls. When he has communicated, Keaton has gone out of his way to be dictatorial, evasive, and belittling in his communications with Staci and to throw a wrench in her plans or requests that she has made. He has refused to keep Staci apprised of medical appointments and school activities, thereby alienating her from MC's life. Keaton has tried to block Staci from being a part of MC's milestone events.

In addition to his failure to communicate with and be civil to Staci, Keaton consistently failed to comply with court orders. He blocked Staci from school and medical information. He interfered with Staci's visitation time. He took MC with him when he spent the night with his girlfriend multiple times. By Keaton's own testimony, he does not see a problem with his behavior and does not plan to change. "Further, we have held that

25

the combined, cumulative effect of particular facts may together constitute a material change." *Wallis*, 2023 Ark. App. 137, at 5, 661 S.W.3d at 288.

The AAL expressed serious concerns about Keaton's ability to parent. She felt Keaton did a good job parenting *when he was married to Jessica and had her support and back-up*. She advised the court that Keaton did an excellent job at that time "but partly because Miss Jessica was an excellent step-parent and because [MC] is a great kid." Now the AAL is "very concerned" that Keaton has love interests that are inconsistent in their involvement with MC, which is unhealthy and confusing. According to the AAL, that is not a good environment in which to raise children. The AAL concluded:

> And I don't believe that Mr. Dillinger has a great deal of integrity at this point. I don't know that he has a lot of empathy for other people. And I'm concerned that those moral-fitness factors are making it difficult for him to parent and coparent his daughter. I know he loves [MC]. [MC] loves him very much. And [MC] reassures me that she has not been neglected in his care. But I don't know that that's enough, Your Honor.

The circuit court acknowledged Keaton had made the AAL's job much harder, and his behavior was the reason the parties were in court. The court commented that it is remarkable that MC appears to be doing as well as she is under the circumstances. In its written order, the court simply found that there was no material change in circumstances sufficient to modify custody. It did not explain its reasoning for that conclusion or address the best interest of the child. However, as stated by Staci's counsel, "We need not watch a runaway car actually run over a child before helping the child get out of the vehicle's path." Or, as previously stated by this court, "There is no requirement that the trial court wait until the children are actually harmed before finding that a material change in circumstances

26

warranting a change in custody exists." *Sission v. Sission*, 2012 Ark. App. 385, at 13, 421 S.W.3d 312, 319.

We have before us a case in which the combined, cumulative effect of facts together constitutes a material change, and I am left with a definite and firm conviction that a mistake has been made. *See Redman*, 2024 Ark. App. 562, 701 S.W.3d 40. I reach this conclusion without second-guessing credibility determinations made by the circuit court because my conclusion is supported by undisputed facts as well as the circuit court's findings. In addition to no longer being married to Jessica, Keaton has failed to communicate, increasingly alienated Staci, and demonstrated an astounding inability to cooperate or abide by court orders. I would reverse the circuit court's determination that there has not been a material change in circumstances and remand the case for the circuit court to determine who should have custody, based on MC's best interest. For these reasons, I dissent.

BARRETT, HIXSON, and MURPHY, JJ., agree.

*Lancaster Law Firm, PLLC*, by: *Clinton W. Lancaster*, for appellant.

One brief only.

27